**BASE METAL TRADING SA, Base Metal Trading Ltd., Alucoal Holdings Ltd., Mikom, Davis International, LLC, Holdex, LLC, Foston Management, Ltd., Omni Trusthouse, Ltd., Nexis Products, LLC, and Polyprom, Ltd., Plaintiffs,**

v.

**RUSSIAN ALUMINUM, Rual Trade Ltd., Sibirsky Aluminum Products USA Corp. a/k/a Sibirsky Aluminum (US), Sibirsky Aluminum (Russia), Bauxal Management, SA, Metcare Management, SA, Unimetal Limited, SA, Oleg Deripaska, Mikhail Chernoi, Blonde Management, Inc., Blonde Investments, Corp., Pan–American Corp., Arnold Kislin, Iskander Makhmudov, Moskovskiy Delovoi Mir Bank, Novokuznetsk Aluminum Zavod, New Start Group Corp., Venitom Corp., Unidale LLC, and Investland, LLC. Defendants.**

No. 00 CIV.9627 JGK.

United States District Court,
S.D. New York.

March 27, 2003.

Robert Abrams, Stroock & Stroock & Lavan, L.L.P., New York City, Bruce S.

Marks, Marks & Sokolov, L.L.P., Philadelphia, PA, Raymond N. Hannigan, Herrick, Feinstein, LLP, New York City, for plaintiffs.

Michael D. Burrows, Robert M. Buschmann, Winston & Strawn, New York City, for Sibirsky Aluminum Group, Sibirsky Aluminum Products USA Corp., Bauxal Management, S.A., Metcare Management, S.A., Unimetal Limited, S.A., and Mr. Oleg Deripaska.

Ira M. Feinberg, John A. Redmon, Hogan & Hartson L.L.P., New York City, for Novokuznetsk Aluminum Zavod.

Paul R. Grand, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, for Russian Aluminum, RUAL Trade Ltd.

Richard Schaeffer, Peter Venaglia, Dornbush, Mensch, Mandelstam & Schaeffer, LLP, New York City, for New Start Group Corp., Venitom Corp., Unidale LLC, Investland, LLC.

Victor Roger Rubin, International Law Counsel, PC, New York City, for Mikhail Chernoi, Chernoi Companies.

Raymond L. Vandenberg, Vandenberg & Feliu, LLP, New York City, for Moskovskiy Delovoi Mir Bank.

Brian S. Cousin, Greenberg Traurig, LLP, New York City, for Panamerican Trade Corp.

Elizabeth M. Johnson, Law Offices of Lawrence S. Goldman, Lisa C. Cohen, Schindler Cohen & Hochman LLP, New York City, for Arnold Kislin and Blonde Managemnet, Inc.

Robert E. Hauberg, Jr., Baker, Donelson, Bearman & Cauldwell, Washington, DC, for Iskander Makhmudov.

## OPINION AND ORDER

KOELTL, District Judge.

This is a case about two Russian companies, Novokuznetsk Aluminum Zavod ("NKAZ") and Kochkanarsky GOK ("GOK"), Russia's largest producers of aluminum and vanadium, respectively. The plaintiffs' claims arise from the defendants' alleged illegal takeovers of these companies by means including bribery of local Russian political officials, judicial corruption in Russia, and armed force. The plaintiffs argue that the defendants drove NKAZ and GOK into bankruptcy and then gained control of the companies through sham bankruptcy proceedings overseen by allegedly corrupt local Russian judges. The plaintiffs seek over $3 billion for alleged damages. The defendants have now moved to dismiss the current Complaint on many bases, including *forum non conveniens*.

The plaintiffs, Base Metal Trading, SA ("BMT SA"), Base Metal Trading, Ltd. ("BMT Ltd."), Alucoal Holdings, Ltd. ("Alucoal") (collectively the "BMT Plaintiffs"), MIKOM (collectively, with the BMT Plaintiffs the "NKAZ Plaintiffs" or the "Aluminum Plaintiffs"); Davis International, LLC ("Davis"), Holdex, LLC ("Holdex"), Foston Management, Ltd. ("Foston"), Omni Trusthouse, Ltd. ("Omni") (collectively the "Davis Plaintiffs"); Nexis Products, LLC ("Nexis") and Polyprom (collectively the "GOK Plaintiffs") bring this action for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, intentional interference with contract, and conversion. The defendants are Sibirsky Aluminum Group ("Sibirsky Russia"), Sibirsky Aluminum Products USA Corp. ("Sibirsky USA"), Bauxal Management, S.A. ("Bauxal"), Metcare Management, S.A. ("Metcare"), Unimetal Limited, S.A. ("Unimetal"), Mr. Oleg Deripaska ("Deripaska") ("collectively the "Sibirsky Defendants"), Russian Aluminum, RUAL Trade, Ltd. ("RUAL"), Mikhail Chernoi ("Chernoi"), Blonde Management, Inc. ("Blonde Management"), Blonde Investments, Corpora-

tion ("Blonde Investments"), Pan–American Corporation ("Pan–American"), Arnold Kislin ("Kislin"), Iskander Makhmudov ("Makhmudov"), Moskovskiy Delovoi Mir Bank ("MDM Bank"), NKAZ, New Start Group Corporation ("New Start"), Venitom Corporation ("Venitom"), Unidale LLC ("Unidale") and Investland, LLC ("Investland") (New Start, Venitom, Unidale and Investland hereinafter the "GOK Defendants").

The Sibirsky Defendants now move to dismiss on the basis of *forum non conveniens* and all defendants join this motion. MDM Bank has also filed a motion to dismiss for *forum non conveniens.* The Sibirsky Defendants move pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss for lack of subject matter jurisdiction and failure to state a claim, as well as failure to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). All defendants join in this motion. Two motions to dismiss on the ground of comity have also been filed, one by NKAZ and the other by the GOK Defendants. All defendants join in these motions.

## I.

On December 19, 2000, the BMT Plaintiffs—BMT SA, BMT Ltd. and Alucoal—filed suit in this Court alleging that defendant Deripaska, the head of Sibirsky Aluminum, and his partner, defendant Chernoi, conspired with others to monopolize the Russian aluminum industry beginning in the 1990's. (Original Compl. ¶ 1.) The Complaint alleged that Sibirsky, comprising Sibirsky Aluminum and its affiliates, including Russian Aluminum, took over NKAZ through rigged bankruptcy pro-

ceedings in the Kemerovo Region of Russia. (Original Compl. ¶ 5.) The Kemerovo Region is located in Western Siberia north of the border between Kazakhstan and Mongolia. Once in control of NKAZ, Sibirsky terminated contracts between NKAZ and the BMT Plaintiffs and forced the BMT Plaintiffs to enter into less favorable contracts with Sibirsky affiliates. (Original Compl. ¶ 6.) None of the BMT Plaintiffs are United States citizens or residents. (Am.Compl.¶¶ 23, 25, 27.)

In May, 2001, all of the defendants filed motions to dismiss on a series of grounds, including *forum non conveniens* and lack of subject matter jurisdiction. In response, the BMT Plaintiffs amended the Complaint on August 3, 2001 to add seven new plaintiffs, including three United States corporations.[1] The Amended Complaint added twelve new defendants and a new scheme to take over GOK, in addition to NKAZ. The Amended Complaint alleges a:

massive racketeering scheme beginning in the 1990's among, *inter alia,* the members of an international Russian–American organized crime group, headed by Mikhail Chernoi, and including business moguls Oleg Deripaska, the head of Sibirsky Aluminum, and Iskander Makhmudov, the then de facto head of MDM Bank, and the Izmailovo Russian–American mafia group to take over and monopolize the Russian aluminum and other metals industries (the "Illegal scheme").

(Am.Compl.¶ 1.) The plaintiffs claim Chernoi, Deripaska, and Makhmudov ("the Conspirators"), as well as their allies and

---

**1.** The motions currently before the Court seek to dismiss the claims alleged in the First Amended Complaint filed August 3, 2001. However, by Stipulation and Order dated March 27, 2002, the parties agreed that the plaintiffs could file a Second Amended Complaint solely to amend paragraphs 11, 294, 297 and 300 of the First Amended Complaint. As such, the Court will consider the motions as directed to the pending Second Amended Complaint but will cite to the First Amended Complaint unless otherwise specified.

the companies they control, directly or indirectly committed numerous criminal acts including physical violence, mail and wire fraud, and money laundering in the United States in furtherance of the illegal scheme. (Am.Compl.¶¶ 2–4.)

The Amended Complaint comprises two primary parts. First, the BMT Plaintiffs and one new party, MIKOM, reallege that the Conspirators took over NKAZ in 2000 by using rigged bankruptcy proceedings.[2] (Am.Compl.¶¶ 5–6.) Second, the remainder of the new plaintiffs bring new claims for the alleged illegal takeover of GOK through physical force, bribery, and extortion.[3] (Am.Compl.¶ 5.)

Changes to one section of the Original Complaint exemplify the way in which the plaintiffs try to meld the new claims into the old to form one coherent scheme. The Original Complaint included a section entitled "The Aluminum Wars" that traced the history of an alleged series of "wars" to control the Russian aluminum industry precipitated by its privatization in the 1990s. (Original Complaint ¶¶ 68–71.) The BMT Plaintiffs alleged that during this period and continuing to the present, Deripaska and Chernoi conspired together to take over the Russian aluminum industry, including NKAZ. (Original Compl. ¶ 71.) These allegations have been newly styled in the Amended Complaint as the history of "The Metal Wars." The sole changes to the Original Complaint are added references to the vanadium industry and other metal industries that are tacked on to the text of the Original Complaint. (Am.Compl.¶¶ 122–24.) Additionally, Chernoi and Deripaska are now alleged to have been joined by defendant Makhmudov in conspiring to control the Russian metals industry, including NKAZ and GOK. (Am.Compl.¶ 124.)

(A)

The Amended Complaint first tells the story of the defendants' alleged illegal takeover of the Russian aluminum industry, particularly with respect to NKAZ. The first steps in this scheme allegedly included takeovers of three other Russian aluminum companies: Krasnoyarsk Aluminum Zavod ("KRAZ"), Sayansk Aluminum Zavod ("SAZ"), and Bratsk Aluminum Zavod ("BRAZ"). (Am.Compl.¶¶ 123, 125–47.) The Conspirators allegedly effected the takeovers through various illegal means, including redirecting the shipment of finished aluminum from the factories, the murder of numerous rivals in association with the Izmailovo Mafia, the filing of false criminal charges against an official of KRAZ, rigged Russian court proceedings and economic extortion. (Am. Compl.¶¶ 130, 136, 138, 140, 142, 145.)

Beginning in late 1994 or early 1995, plaintiff MIKOM, under its president Mikhail Zhivilo ("Zhivilo"), entered into a con-

---

2. The Amended Complaint alleges that "Deripaska, Chernoi, Makhmudov, Malevsky, MDM Bank, Pan–American, Blonde Management, Blonde Investments, Kislin, Karam, Transmetal, Trans–Commodities, Russian Aluminum, RUAL, SibAl, Sibirsky U.S., Bauxal, Metcare, Unimetal, NKAZ, KRAZ, BRAZ and SAZ constitute an 'association-in-fact' formed for the common purpose of taking over the aluminum and other metals industries in Russia and diverting, appropriating, and distributing profits from the Illegal Scheme, continuing from the mid–1990's through today (the "Aluminum Enterprise")." (Am.Compl.¶ 518.)

3. The Amended Complaint alleges that "Deripaska, Chernoi, Makhmudov, Malevsky, MDM Bank, Pan–American, Blonde Management, Blonde Investments, GOK, Kislin, Karam, Transmetal, Trans–Commodities, New Start, Venitom, Unidale and Investland constitute an 'association-in-fact' formed for the common purpose of taking over the vanadium and other metals industries in Russia and diverting, appropriating, and distributing profits from the Illegal Scheme, continuing from the mid–1990's through today (the "Vanadium Enterprise")." (Am.Compl.¶ 519.)

tract to manage NKAZ. (Am.Compl.¶¶ 12, 30, 148.) MIKOM then solicited Western trading partners such as BMT Ltd. to extend loans to NKAZ and to trade with the company. (Am.Compl.¶ 149.) At that time, NKAZ purchased approximately 70% of its alumina, a raw material necessary to produce aluminum, from the Pavlodarsky Aluminum Zavod ("PAZ"). (Am. Compl.¶ 150.) At about the same time, the plaintiffs allege, Chernoi and his allies gained control of PAZ and threatened to stop shipments of alumina to NKAZ unless NKAZ gave them 50% of its aluminum sales profits and 50% of the shares in NKAZ. (Am.Compl.¶ 151.) Chernoi later manipulated NKAZ into buying all of its alumina from PAZ at a premium. (Am. Compl.¶ 152.)

In August 1995, Zhivilo informed Chernoi that NKAZ and BMT Ltd. would no longer trade with PAZ. (Am.Compl.¶ 161.) The plaintiffs allege that shortly thereafter, Deripaska and Chernoi made direct and indirect threats on Zhivilo's life that were followed by an unsuccessful attempt to assassinate him. One of the threats was allegedly made to Yuri Zhivilo, Mikhail Zhivilo's brother, in Chicago, Illinois in 1995. (Am.Comp.¶¶ 165–66.) Other threats were allegedly made directly to Mikhail Zhivilo in Tel Aviv, Israel and in Paris, France. (Am.Comp.¶¶ 165–70, 189.) In response to the threats, BMT Ltd., NKAZ, and Alucoal allegedly paid millions of dollars in protection money to the Conspirators between April, 1996 and October,

1999. (Am.Compl.¶¶ 172–74.) The payments were allegedly made through several New York banks and the funds were eventually laundered through various entities including defendants Pan–American and Blonde Management. (Am. Compl.¶¶ 173–176.)

In or about 1997, Russian President Boris Yeltsin appointed Aman Tuleyev ("Tuleyev") as Kemerovo Regional Governor. (Am.Compl.¶ 186.) The next year Tuleyev allegedly began demanding that Zhivilo pay bribes from NKAZ, MIKOM, BMT Ltd. and BMT SA. (Am.Compl.¶ 187.) Tuleyev threatened that failure to pay would result in the transfer of NKAZ to the Conspirators. (Am.Compl.¶ 188.)

In 1999, the Conspirators and Tuleyev allegedly joined together to take over NKAZ illegally with the assistance of the local energy provider, Kuzbass. (Am. Compl.¶¶ 177, 193–94.) The essence of the takeover scheme was for Kuzbass to "assert false tariff claims [against NKAZ], file suit upon them, and obtain a sham judgment against NKAZ, with the active assistance of Tuleyev, using the corrupt Russian regional court system."[4] (Am. Compl.¶ 199.) This would allow the Conspirators to force NKAZ into an involuntary bankruptcy after which the Conspirators could place their own agents in control of the company. (Am.Compl.¶ 202.) The Conspirators would then cancel NKAZ's trading contracts with the BMT Plaintiffs as well as the management contract with

---

**4.** The regional court at issue was the Kemerovo Arbitrazh Court. Russian arbitrazh courts comprise a three-tier system of courts with jurisdiction over commercial disputes, including bankruptcies. (Declaration of Paul B. Stephan III dated Jan. 28, 2002 ("Stephan 2002 Decl.") ¶¶ 6–8.) The first level of the arbitrazh courts presides over the "first instance" of cases and can also hear appeals of those decisions. (Stephan 2002 Decl. ¶ 7.) Ten Federal Circuit Arbitrazh Courts exercise appellate review, or "cassation" review, over both first instance and appellate decisions of the lower court. (Stephan 2002 Decl. ¶ 7.) Finally, the Supreme (or Higher) Arbitrazh Court in Moscow has original jurisdiction over certain cases involving the Russian Federation, exercises supervisory review over the arbitrazh courts (roughly the equivalent of the certiorari jurisdiction of the United States Supreme Court), and has the authority to reopen closed cases in view of newly discovered evidence. (Stephan 2002 Decl. ¶ 7.)

MIKOM and replace those companies with affiliates of the Conspirators. (Am. Compl.¶ 201.) The Conspirators would profit from the scheme by supplying raw materials to NKAZ and then trading in the finished aluminum, while Kuzbass would receive higher energy payments for its participation in the takeover. (Am. Compl.¶ 200.) For his role in the takeover, Tuleyev allegedly received $3 million between 1999 and 2000 paid at least in part with funds wired by Pan–American, Blonde Management, and Blonde Investments through American banks at Kislin's instruction. (Am.Compl.¶¶ 196–98, 455, 459.)

The plaintiffs allege that the illegal scheme unfolded as follows. Beginning in late 1994, NKAZ contracted with Kuzbass to supply energy at agreed upon rates. (Am.Compl.¶¶ 204–06.) In an action filed on November 12, 1997 in the Kemerovo Arbitrazh Court, Kuzbass repudiated its agreements with NKAZ in response to which NKAZ filed a counter suit. (Am. Compl.¶¶ 208–15.) As a result of the dispute, the Kemerovo Arbitrazh court ultimately awarded Kuzbass a judgment of approximately $26.3 million on October 21, 1999. (Am.Compl.¶ 216.) The plaintiffs contend that Tuleyev influenced the arbitrazh court to obtain this result. (Am. Compl.¶ 216.) NKAZ unsuccessfully appealed the award to the appellate branch of the Kemerovo Arbitrazh Court which was "also apparently under the influence of Tuleyev" and which entered a final judgment upholding the award on December 24, 1999. (Am.Compl.¶¶ 217–18.) NKAZ then appealed the award to the West Siberian Circuit Federal Arbitrazh Court in Tyumen. (Am.Compl.¶ 219.) The court stayed the execution of the award on or about January 19, 2000 pending consideration of the appeal. (Am. Compl.¶ 220.)

Despite the stay, Kuzbass prevailed on an *ex parte* petition to the Kemerovo Arbitrazh Court for an order declaring NKAZ bankrupt, appointing Sergey A. Chernyshev ("Chernyshev") as Provisional Manager, and imposing allegedly unnecessary conservatory measures on the company. (Am.Compl.¶ 222–24, 227–230.) The plaintiffs claim that the bankruptcy order constituted a clear violation of Russian law which requires an executable judgment of a creditor in order to place a business into involuntary bankruptcy. (Am. Compl.¶¶ 221, 225.) Moreover, the plaintiffs claim that NKAZ was never bankrupt. (Am.Compl.¶ 226.)

The plaintiffs contend that Chernyshev proceeded to issue a series of unreasonable information requests on MIKOM and used MIKOM's failure to satisfy the requests promptly as a basis for his petition to remove the company as NKAZ's manager.[5] (Am.Compl.¶¶ 231–236.) Kuzbass also petitioned the arbitrazh court to remove MIKOM using information supplied by Chernyshev from his investigation. The gist of the information was that MIKOM was hiding money that should have been used to pay current debts. (Am.Compl.¶¶ 237–38.) In an allegedly unusual step, the local Kemerovo procurator filed a separate petition for bankruptcy against NKAZ at the behest of Tuleyev. (Am.Compl.¶¶ 239–41.) The plaintiffs claim that the procurator did so "to signal to the Kemerovo court that the local political authorities supported Chernyshev's position and Kuzbass' petition." (Am.Compl.¶ 239.) At an alleged sham hearing on February 16 and 17, 2000 the arbitrazh court summarily granted the motions for MIKOM's removal and Cher-

---

5. As provisional manager in the early stages of a bankruptcy, Chernyshev's role was to gather information about the bankrupt company on behalf of the arbitrazh court. (Am. Compl.¶ 230.)

nyshev's appointment. (Am.Compl.¶¶ 245, 252–57.) The plaintiffs claim that the BMT Plaintiffs, NKAZ, and MIKOM were denied important procedural rights at the hearing, including the full opportunity to present evidence and to properly cross-examine witnesses, as well as timely access to an interpreter. (Am.Compl.¶¶ 252–56, 258–59.)

Once installed as Acting Manager, Chernyshev instructed NKAZ's attorneys to cease to pursue the actions preceding the award and to withdraw prosecution of NKAZ's claims against Kuzbass. (Am. Compl.¶¶ 261–64.) Chernyshev proceeded to recognize a series of allegedly fictitious claims against NKAZ by companies controlled by the Conspirators totaling approximately $70 million. (Am. Compl.¶¶ 265–67.) Recognition of the false creditors provided the Conspirators with voting power at subsequent creditor meetings where control of the agenda was proportional to the sums due to each creditor. (Am.Compl.¶ 268.) At the same time, Chernyshev allegedly refused to recognize valid claims asserted by BMT Ltd. and Alucoal worth approximately $60 million. (Am.Compl.¶ 269.) These maneuvers altered the balance of power at future creditor meetings because prior to the allegedly illegal takeover the BMT Plaintiffs allegedly held the majority of NKAZ's debt. (Am.Compl.¶ 270.)

At the first creditors' meeting, the new creditors voted to place NKAZ under external management and to appoint Chernyshev to the position of External Manager. (Am.Compl.¶ 272.) The Kemerovo Arbitrazh Court confirmed the appointment on March 20, 2000, enabling Chernyshev to cancel NKAZ's contracts with the BMT Plaintiffs for the supply of raw materials and subsequent purchase of finished aluminum. (Am.Compl.¶¶ 272–76.) Chernyshev then entered into substitute purchase and supply contracts with compa-

nies controlled by the Conspirators. (Am. Compl.¶¶ 276–290.)

While not referred to in the Amended Complaint, BMT SA, supported by MIKOM, sought review of the Arbitrazh Court's March 20, 2000 decision in the West Siberian Circuit Federal Arbitrazh Court. The Circuit Court rejected all of the grounds for appeal finding, among other things, that NKAZ was insolvent. (Declaration of Paul B. Stephan III ("Stephan") dated Jan. 28, 2002 ("Stephan 2002 Decl.") ¶ 29; Decree of the Federal Arbitration Court of the West Siberian District dated July 3, 2000 ("West Siberian District July 3, 2000 Decree") attached as Ex. 112 to Second Declaration of Sergei Chernyshev dated Jan. 27, 2002 ("Chernyshev Decl.").)

The Conspirators allegedly reached a subsequent agreement with an unnamed powerful Russian oligarch to form Russian Aluminum, thus establishing a monopoly over the Russian aluminum industry. (Am.Compl.¶ 305.) This partnership freed the Conspirators from their need to partner with Kuzbass, and Chernyshev subsequently attempted to remove Kuzbass from NKAZ's list of outstanding creditors. (Am.Compl.¶¶ 306–10.) Tying up further loose ends, Tuleyev accused Zhivilo of conspiring to have him murdered. (Am. Compl.¶ 302.) As a result, allegedly false charges were filed against Zhivilo before he sought asylum in France in February 2001. (Am.Compl.¶¶ 302–04.)

In or about August 2000, the Conspirators secured total control of NKAZ by allegedly forcing its shareholders to sell their stock at distressed prices to four unspecified companies controlled by the Conspirators. (Am.Compl.¶¶ 312–13.) At a final creditors' meeting on March 6, 2001, through the votes of the allegedly false creditors recognized by Chernyshev, the Conspirators won approval of a bank-

ruptcy settlement. (Am.Compl.¶ 315.) The settlement was allegedly highly prejudicial to NKAZ's legitimate creditors, including the BMT Plaintiffs. (Am. Compl.¶ 316.) The Kemerovo Arbitrazh Court approved the allegedly sham settlement on April 3, 2001. (Am.Compl.¶ 317.) Again, while not referred to in the Amended Complaint, BMT SA and others appealed the April 3, 2001 decision of the Kemerovo Arbitrazh Court to the West Siberian Circuit Federal Arbitrazh Court. On September 6, 2001, a panel of three judges, different from those who heard the previous appeal, approved the settlement agreement terminating the bankruptcy. (Stephan 2002 Decl. ¶ 30; Resolution of the Federal Arbitrazh Court of the Western–Siberian Circuit dated Sept. 6, 2001 ("West Siberian Circuit Sept. 6, 2001 Resolution") attached as Ex. 133 to Chernyshev Decl.)

The Conspirators allegedly remain in control of NKAZ today and use the sales and purchasing power of the company to benefit their affiliates, including defendants Metcare, RUAL, Bauxal and Unimetal. (Am.Compl.¶ 321.) The plaintiffs claim that the Conspirators also siphon profits from the company while failing to pay the legitimate debts owed to the NKAZ Plaintiffs. (Am.Compl.¶ 322.)

### (B)

The Amended Complaint contains a new series of claims not present in the Original Complaint and in which the BMT Plaintiffs play no part. The claims involve a conspiracy to take over GOK, "Russia's largest vanadium ore mining factory." (Compl.¶ 5.) GOK is located in the Sverdlosk Oblast which is situated on the east side of the Ural Mountains north of central Kazakhstan. Six new plaintiffs bring these allegations: Davis, Holdex, Foston and Omni (collectively the "Davis Plaintiffs"), as well as Nexis and Polyprom (collectively the "GOK Plaintiffs"). These allegations can be divided into two parts.

First, the Davis Plaintiffs allege the fraudulent transfer of their shares in GOK which collectively totaled over 70% of the company. (Am.Compl.¶¶ 32–36.) Second, the GOK Plaintiffs allegedly maintained contracts and loan agreements with GOK that GOK then breached. (Am. Compl. ¶¶ 37–39.)

The plaintiffs' narrative of the events involving GOK similarly begins with claims of extortion and threats of violence. In December 1998, Jalol Khaidarov ("Khaidarov") became general director of GOK after having worked as a financial advisor for Chernoi and Makhmudov. (Am. Compl.¶ 341.) In April 1999, Khaidarov allegedly met twice with his former employers in Paris to discuss GOK. (Am. Compl.¶ 342.) At the second meeting, Chernoi allegedly instructed Khaidarov to convince GOK's shareholders to transfer their shares to Chernoi and Makhmudov and reminded Khaidarov that, "Some people refuse my offers. But for the rest of their lives, they wear bullet proof jackets." (Am.Compl.¶ 343.)

In response to ongoing threats, GOK's controlling shareholders agreed preliminarily to sell 20% of their shares to a company controlled by the Conspirators. (Am.Compl.¶ 344.) Makhmudov and Chernoi made a $5 million down payment on the shares with money allegedly wired through an unnamed United States bank. (Am.Compl.¶ 345.) However, Makhmudov and Chernoi were soon unsatisfied and demanded that Khaidarov arrange for the transfer of additional shares. (Am. Compl.¶ 346.) Believing that the two men would never be satisfied, the shareholders returned the $5 million and cancelled the transfer. (Am.Compl.¶ 347.)

Similar to the allegations concerning the NKAZ takeover, the plaintiffs allege that the Conspirators bribed the local Governor to aid in their scheme. (Am.

Compl.¶¶ 352–55.) Eduard Roussel ("Roussel"), Governor of the Sverdlovsk Oblast as of 1999, was allegedly paid for "protection" and "help" in support of the Conspirators' efforts to do business in the region. (Am.Compl.¶¶ 352–53, 355.) Makhmudov and Chernoi allegedly paid Roussel "more than $850,000 in bribes ... so that Roussel would allow them to use the police to take over GOK and would exercise his influence over the corrupt Sverdlovsk judiciary." (Am.Compl.¶ 458.) These "payments were made by Pan–American and Blonde Management through banks in the United States to MDM Bank for conversions into cash for payment at the direction of Roussel." (Am.Compl.¶ 354.)

On or about January 28, 2000, with the support of regional authorities, Makhmudov and Chernoi allegedly sent a group of armed thugs to take over GOK physically. (Am.Compl.¶ 356.) The Conspirators then used bribes and threats of physical force to convince four members of GOK's Board of Directors to vote to remove Khaidarov as general director and to replace him with Andrey Kozitsin ("Kozitsin"), an alleged agent of the Conspirators. (Am. Compl.¶ 357.) This vote allegedly violated GOK's charter which required five votes in order to remove the general director. (Am.Compl.¶ 357.) The Complaint alleges that the three remaining board members asked prosecutors in the Kachkanar and Sverdlovsk areas to initiate criminal proceedings in connection with the GOK takeover. (Am.Compl.¶ 358.) However, the Kachkanar City Court upheld the Board's vote in a decision dated February 1, 2000. (Ruling of the Kachkanar City Court dated Feb. 1, 2000 attached as Ex. 41 to Declarations of Oleg S. Kozyrev ("Kozyrev") (no date) and Samir Kapoura ("Kapoura") (no date) ("Kozyrev/Kapoura Decls.").)

To thwart any further efforts by GOK shareholders to reacquire control of the company, the Conspirators and MDM Bank allegedly arranged for GOK to incur massive false debts in February 2000. (Am.Compl.¶¶ 371–86.) By the end of this brief period, a series of sham transactions left a small company named Leybout in possession of approximately $39 million in demand promissory notes issued by GOK. (Am.Compl.¶¶ 373–86.) The Conspirators then caused Krasnouralskmezhraigaz ("Kras Gas"), a local natural gas company in the Sverdlovsk Region, to file an involuntary bankruptcy petition against GOK on March 24, 2000. (Am.Compl.¶ 387.) Although the plaintiffs claim that the petition should not have been granted under Russian law because Kras Gas' receivables were not overdue, the Sverdlovsk Arbitrazh Court did just that and appointed Oleg Kozyrev ("Kozyrev") Provisional Manager of GOK on March 30, 2000. (Am.Compl.¶¶ 388–89.) After he was appointed Provisional Manager, Kozyrev refused to recognize what the plaintiffs contend was a $7 million valid claim by Nexis arising from a "certain" loan agreement with GOK. (Am.Compl.¶ 390.)

At the time of the GOK creditors' initial meeting, Leybout's allegedly fraudulent claims left that company with 94% of the creditor votes. (Am.Compl.¶ 391.) At the meeting the creditors nominated Kozyrev as External Manager. (Am.Compl.¶ 392.) On March 30, 2000, the Sverdlovsk Arbitrazh Court approved Kozyrev's appointment, having been signaled allegedly to do so by Roussel's Sverdlovsk Oblast government. (Am.Compl.¶ 392–94.)

What came next, according to the Davis Plaintiffs, was a series of fraudulent transfers of their shares in GOK, often through defendant New Start, and ultimately to defendants Venitom, Unidale, and Investland. (Am.Compl.¶¶ 397–423.) The plaintiffs claim that these four companies are owned and controlled by the Conspirators.

(Am.Compl.¶ 431.) Defendant Kislin allegedly arranged for the incorporation of the companies, a process paid for with funds from Blonde Management or Pan–American. (Am.Compl.¶¶ 433–34.)

The first step in the fraudulent transfers was allegedly to install VRK Company, a company "friendly" to the Conspirators, as GOK's registrar of shares. (Am. Compl.¶ 397.) VRK Company then improperly "registered a transfer of about 35 million shares of GOK from Davis to New Start . . ." while disguising the transfer as a legitimate sale. (Am.Compl.¶¶ 399–402.) The Amended Complaint alleges that the "Davis [s]hares, in whole or in part, are currently registered in the name of Investland, Unidale, and/or Venitom, having been transferred to them by New Start." (Am. Comp.¶ 403.)

Omni's shares in GOK, allegedly purchased from "various entities who had acquired the shares as a result of a judicial sale that occurred in September 1998," were transferred as the result of a lawsuit filed in the Chelyabinsk Arbitrazh Court in the spring of 2000 to set aside the judicial sale. (Am.Compl.¶¶ 404–06.) The Chelyabinsk Oblast, in which the Chelyabinsk Arbitrazh Court is located, is situated south of the Sverdlosk Oblast and just north of Kazakhstan. In October 2000, the Appellate Instance for the Arbitrazh Court for the Chelyabinsk Region affirmed the lower court's decision setting aside the judgment and ordered that the stock be re-registered to Omni's detriment. (Am. Compl.¶ 407.) The plaintiffs contend that "[c]ontrary to Russian law, Omni was never notified of or participated in these proceedings and did not learn of the transfer until two months after it took place." (Am.Compl.¶ 409.) While the Complaint does not mention the fact, the October 2000 decision of the Appellate Instance for the Arbitrazh Court for the Chelyabinsk Region was affirmed by the Arbitrazh

Court for the Urals Circuit on December 4, 2001. (Ruling by the Urals Circuit Federal Arbitrazh Court dated Dec. 4, 2001 attached as Ex. 85 to Kozyrev/Kapoura Decls.) Omni's shares in GOK are alleged to be registered currently, in whole or in part, in the name of Investland, Unidale, and/or Venitom. (Am.Compl.¶ 410.)

In 2000, three Russian plaintiffs sued Foston in the Solntsevo Intermunicipal Court in Moscow for a declaration requiring Foston to transfer its shares in GOK. (Am.Compl.¶ 411.) Foston allegedly received no notice of the suit and instead a forged power of attorney was submitted to the court on the company's behalf. (Am. Compl.¶ 412.) On September 29, 2000 the Intermunicipal Court ordered the unopposed transfer of 1.2 million GOK shares to three companies. (Am.Compl.¶ 413.) The Amended Complaint never identifies these companies except to say that they are owned and controlled, directly or indirectly, by the Conspirators. (Am. Compl.¶ 413.) Foston allegedly did not know of the proceedings or of the transfer until October 31, 2000 and subsequently won a reversal of the decision in the Moscow City Court. (Am.Compl.¶¶ 414–15.) However, the plaintiffs claim that Foston no longer has control of its shares as a result of the Intermunicipal Court's original decision, and they are instead in the possession of Investland, Unidale, and/or Venitom. (Am.Compl.¶ 416.)

Finally, the Amended Complaint alleges that in 2000, at the direction of the Conspirators, GOK filed suit in the Kalmykia Arbitrazh Court against Polyprom seeking a declaration that GOK's original sale of shares to Polyprom was invalid. (Am. Compl.¶¶ 417, 423.) Kalmykia is located in the southwestern part of Russia bordering the Caspian Sea. Polyprom had sold the shares obtained from GOK to Holdex. (Am.Compl.¶ 417.) The arbitrazh court

ruled in favor of GOK on November 22, 2000 and ordered that the GOK shares then owned by Holdex be re-registered to an unnamed Russian company. (Am. Compl.¶418.) The plaintiffs contend that the arbitrazh court's decision was based on a forged contract purported to have been signed by GOK and Polyprom in January 1999. (Am. Compl. ¶418.) The plaintiffs claim that, in violation of Russian law, neither Holdex nor Polyprom was notified of the proceedings and that neither learned of the re-registration until months after the November 2000 order. (Am.Compl.¶419.) On April 17, 2001 the Federal Arbitrazh Court for the Caucasus Circuit, which is located in Krasnodar, reversed the decision of the Kalmykia Arbitrazh Court and remanded the case for further fact finding. (Resolution of the North Caucasus Circuit Federal Arbitrazh Court attached as Ex. 79 to Kozyrev/Kapoura Decls.) The plaintiffs claim that Holdex and Polyprom did not receive notice of the subsequent hearing before the Kalmykia Arbitrazh Court. (Am. Compl.¶¶421–22.) Holdex's shares in GOK are alleged to have been transferred to Investland, Unidale, and/or Venitom. (Am.Compl.¶423.)

Once the transfer of shares was complete, the plaintiffs claim, the Conspirators had no use for further bankruptcy proceedings. (Am.Compl.¶424.) GOK thus entered into a sham settlement agreement with its creditors. (Am.Compl.¶424.)

The settlement was allegedly structured so as to make the debt owed to legitimate creditors worthless while transferring control of GOK to the new shareholders—New Start, Venitom, Unidale and/or Investland. (Compl.¶¶428–30.)

While not discussed in the Amended Complaint, the settlement of the GOK bankruptcy was approved by the Arbitrazh Court for the Sverdlosk Oblast on April 19, 2001, despite the objection of Nexis, and that decision was affirmed on June 27, 2001 by the Appellate Instance of the Arbitrazh Court for the Sverdlovsk Oblast. (Determination of the Sverdlovsk Oblast Arbitrazh Court dated Apr. 19, 2001 attached as Ex. 3 to Kozyrev/Kapoura Decls.; Determination of the Sverdlovsk Oblast Arbitrazh Court dated June 27, 2001 attached as Ex. 21 to Kozyrev/Kapoura Decls.) That decision was affirmed in turn by the Federal Arbitrazh Court of the Urals Circuit on August 21, 2001. (Determination of the Federal Arbitrazh Court for the Urals Circuit dated Aug. 21, 2001 ("Urals Circuit Aug. 21 2001 Determination") attached as Ex. 22 to Kozyrev/Kapoura Decls.)

## II.

 The defendants move to dismiss the Amended Complaint pursuant to the doctrine of *forum non conveniens*.[6] "[T]he doctrine of *forum non conveniens* contemplates the dismissal of lawsuits

---

**6.** In view of the defendants' motion to dismiss for lack of subject matter jurisdiction, the plaintiffs initially argued that the Court must decide the existence of jurisdiction before reaching the *forum non conveniens* argument. The argument for lack of jurisdiction was based primarily on the assertion that the RICO statute did not cover the primarily foreign alleged activities asserted in the Amended Complaint. However, the Second Circuit Court of Appeals has recently made clear that it is not necessary to consider such a jurisdictional issue before considering a *forum non*

*conveniens* basis for dismissal. The Court of Appeals held that a court must consider the jurisdictional issue first only where the potential lack of jurisdiction is a constitutional question and where, as here, "jurisdiction revolves around statutory [RICO] requirements, ... no constitutional issue is presented." *Monegasque De Reassurances S.A.M. v. Nak Naftogaz Of Ukraine,* 311 F.3d 488, 497–98 (2d Cir.2002). At argument, in light of *Monegasque*, the plaintiffs withdrew their argument that the RICO issues must be considered before the *forum non conveniens* issues.

brought by plaintiffs in their favored forum in favor of adjudication in a foreign court." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 101 (2d Cir.2000). Pursuant to the recent decisions of the Court of Appeals for the Second Circuit, resolution of a motion to dismiss based on *forum non conveniens* requires a three step analysis: first, determination of the degree of deference to be afforded to the plaintiffs' choice of forum; second, analysis of whether an adequate alternative forum exists; and third, consideration of the private and public factors enumerated by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). *See Iragorri v. United Tech. Corp.*, 274 F.3d 65, 73–74 (2d Cir.2001) (en banc). Each step is discussed below.

(A)

As an initial matter, the Court must determine the degree of deference that should be afforded to the plaintiffs' choice of forum in this case. *See Iragorri*, 274 F.3d at 70–73; *accord Monegasque De Reassurances S.A.M. v. Nak Naftogaz Of Ukraine*, 311 F.3d 488, 498 (2d Cir.2002); *DiRienzo v. Philip Services Corp.*, 294 F.3d 21, 28 (2d Cir.2002); *Varnelo v. Eastwind Transport, Ltd.*, No. 02 Civ.2084, 2003 WL 230741, at *6 & n. 13 (S.D.N.Y. Feb.3, 2003). In *Gulf Oil*, the Supreme Court instructed that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil*, 330 U.S. at 508, 67 S.Ct. 839. The Second Circuit Court of Appeals has interpreted the Supreme Court's instruction to mean that "a court reviewing a motion to dismiss for *forum non conveniens* should begin with the assumption that the plaintiff's choice of forum will stand unless the defendant meets the burden of demonstrating" the factors discussed below. *Iragorri*, 274 F.3d at 71.

"While any plaintiff's selection of a forum is entitled to deference, that defer-

ence increases as the plaintiff's ties to the forum increase." *Wiwa*, 226 F.3d at 101 (collecting cases). Accordingly, "[w]here a foreign plaintiff is concerned ... its choice of forum is entitled to less deference." *Varnelo*, 2003 WL 230741, at *7 (quoting *Murray v. British Broad. Corp.*, 81 F.3d 287, 290 (2d Cir.1996)). This is not due to any prejudice against foreign plaintiffs, but because courts defer to a plaintiff's choice of the home forum "because [the home forum] is presumed to be convenient. In contrast, when a foreign plaintiff chooses a U.S. forum, it is 'much less reasonable' to presume that the choice was made for convenience." *Iragorri*, 274 F.3d at 71 (internal citation omitted) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)); *see also Wiwa*, 226 F.3d at 102; *Varnelo*, 2003 WL 230741, at *7–8.

In *Iragorri*, the Court of Appeals clarified the degree of deference that courts should afford to a United States resident's choice of forum when that plaintiff files suit in a district other than the one in which the plaintiff resides. *Iragorri*, 274 F.3d at 71. The Court of Appeals sought guidance from two types of the Supreme Court's prior *forum non conveniens* cases, those involving a plaintiff who sued in a home forum, and those cases in which a foreign plaintiff brought suit in the United States. *Id.* at 71–72. Based on those precedents, the Court of Appeals concluded that:

The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice. Stated differently, the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the

lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens.* . . . On the other hand, the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less deference the plaintiff's choice commands. . . .

*Id.* at 71–72.

■ Little deference should be given to the plaintiffs' choice of forum in this case. As this litigation was originally brought, not one plaintiff was a citizen or resident of the United States. BMT SA is a Swiss company, BMT Ltd. is organized under the laws of Guernsey, Channel Islands, and Alucoal is organized under the laws of Cyprus.[7] (Am.Compl.¶¶ 23, 25, 27.) After the defendants moved to dismiss the case for lack of subject matter jurisdiction, the BMT Plaintiffs added a Russian plaintiff to the NKAZ claims, MIKOM. (Am. Compl.¶ 29.) The plaintiffs also brought in six other new plaintiffs to assert separate claims arising from the GOK bankruptcy.[8] The new plaintiffs included Foston, another company organized under the laws of Cyprus; another Russian company, Polyprom; Omni, an English company; and three corporations organized under the

---

7. The citizenship of the initial defendants to the action as it was originally brought is as follows: Russian Aluminum is a Russian "Joint Open Stock Company." (Declaration of Paul R. Grand dated Jan. 29, 2002 ("Grand Decl.") ¶ 2 attached as Ex. A to Declaration of Michael D. Burrows dated Jan. 30, 2002 ("Burrows Decl."); Declaration of Stalbek Mishakov dated Jan. 29, 2002 ("Mishakov Decl.") ¶ 3.) Sibirsky USA is a Delaware Corporation with offices in Harrison NY. (Mishakov Decl. ¶ 5.) Sibirsky Russia is a "conglomerate company engaged in numerous businesses in Russia." (Mishakov Decl. ¶ 3.) Bauxal and Metcare are corporations incorporated in the British Virgin Islands. (Mishakov Decl. ¶ 6.) Unimetal is a Panama corporation. (Mishakov Decl. ¶ 6.) Oleg Deripaska is a Russian citizen and resident. (Mishakov Decl. ¶ 10.) Mikhail Chernoi is a resident of Israel, citizenship unknown. (Declaration of Victor Roger Rubin dated Jan. 29, 2002 ("Rubin Decl.") ¶ 2 attached as Ex. B to Burrows Decl.) NKAZ is a Russian company with its principal place of business in the Kemerovo Region of Russia. (Declaration of John A. Redmon dated Jan. 28, 2002 ("Redmon Decl.") ¶ 2 attached as Ex. G to Burrows Decl.) The Original Complaint also named "Chernoi Companies 1 to 10" as defendants. These were "companies organized under the laws of the United States whose identities are unknown through which Chernoi transfers proceeds from the Illegal Scheme through banks in the United States." (Original Compl. ¶ 32.)

8. The citizenship of the defendants added in the Amended Complaint is as follows: RUAL is a trading company organized under the laws of the British Virgin Islands, with offices in the British Virgin Islands, Cyprus, and China. (Grand Decl. ¶ 2.) Blonde Investments is a company organized under the laws of the Cayman Islands with offices in Switzerland. (Rubin Decl. ¶ 3.) Pan–American was a Delaware corporation and was dissolved in or about 1998. (Declaration of Brian S. Cousin dated Jan. 25, 2002 ("Cousin Decl.") ¶ 2 attached as Ex. C to Burrows Decl.) Arnold Kislin is a United States citizen residing in New York. (Declaration of Elizabeth M. Johnson dated Jan. 29, 2002 ("Johnson Decl.") ¶ 2 attached as Ex. D to Burrows Decl.) Blonde Management is a New York company owned by Kislin that is now inactive. (Johnson Decl. ¶ 3.) Iskander Makhmudov is a Russian citizen residing in Russia. (Affidavit of Robert E. Hauberg, Jr. sworn Jan. 25, 2002 ("Hauberg Aff.") ¶ 2 attached as Ex. E to Burrows Decl.) MDM Bank is a bank organized under the laws of the Russian Federation with offices in Russia. (Declaration of Christopher D. Armeniades dated Jan. 24, 2002 ("Armeniades Decl.") ¶ 2 attached as Ex. F. to Burrows Decl.) The declaration submitted by counsel for New Start, Venitom, Unidale, and Investland in support of the motion to dismiss on *forum non conveniens* grounds does not identify the citizenship of these plaintiffs. (Declaration of Richard Schaeffer dated Jan. 25, 2002 ("Schaeffer Decl.") attached as Ex. H to Burrows Decl.) The unspecified "Chernoi Companies 1–10" were dropped from the Amended Complaint.

laws of Virginia, Texas, and Utah, respectively, namely Davis, Holdex and Nexis. (Am.Compl.¶¶ 32–35, 37–38.) [9]

With regard to plaintiffs Davis', Holdex', and Nexis' connections with the United States, the Amended Complaint states only that the companies are organized under the laws of West Virginia, Texas, and Utah, respectively (Am.Compl.¶¶ 32–33, 37.) The record contains no evidence that any of the companies maintain offices in New York. This is a fact that *Iragorri* instructs is not dispositive but that the Court may consider in assessing the relative convenience of bringing this case in this district.

The defendants allege that Davis, Holdex, and Nexis are mere shell companies whose choice of forum should be afforded little deference. In view of the scant information in the record about the American plaintiffs' ties to the United States, the Court asked plaintiffs' counsel to submit affidavits as to the identity of the three companies' officers, directors, and shareholders, including their citizenship, the location of the companies' offices, and the precise nature of their operations in the United States. (Tr. 65–66.) Plaintiffs' counsel agreed to supplement the record and subsequently filed a second declaration by Joseph Traum ("Traum"), the managing director of Davis and beneficial owner of Nexis. (Declaration of Joseph Traum dated Sept. 14, 2002 ("First Traum Decl.") ¶ 1; Second Declaration of Joseph Traum dated Feb. 19, 2003 ("Second Traum Decl.") ¶ 33.) The submission is

telling for how little information it provides about the American plaintiffs.

Traum informs the Court that Davis was organized under the laws of West Virginia in December 1998 by two offshore corporate service companies that served as "nominee members" solely for organizational services. (Second Traum Decl. ¶¶ 4–5.) Traum asserts that the use of nominee registration to form the company "is common in doing business in Russia in order to maintain the confidentiality of the identity of the beneficial owners for reasons of personal safety." (Second Traum Decl. ¶ 6.) Davis now has two "members", a term Traum does not define, one being Traum himself. (Second Traum Decl. ¶ 12.) While Traum tells the Court that "[n]one of the members or officers of Davis are Russian citizens," he identifies only one "member" and one officer by name besides himself, Sara Ofen ("Ofen") and Isaac Savion ("Savion"). (Second Traum Decl. ¶¶ 12, 14, 16.) Traum identifies himself as "an international businessman and native citizen of Israel." (Second Traum Decl. ¶ 2.) He advises that he has lived two years in the United States but it is not clear when that was. (Second Traum Decl. ¶ 3.) Ofen and Savion are allegedly United States citizens but neither's place of residence is revealed. (Second Traum Decl. ¶¶ 12, 14.) Nor have either of them submitted an affidavit to the Court with further information about themselves or their roles at Davis. The only other information that Traum provides about Davis's operations, besides its registered address

---

**9.** The plaintiffs contend that even though some of the plaintiffs are clearly foreign nationals residing outside the United States, international treaty obligations require the Court to afford the plaintiffs equal access to the American courts. *See Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974, 981 (2d Cir.1993); *see also Varnelo,* 2003 WL 230741, at *12 (collecting cases). However, the concept that such treaties may provide

foreign plaintiffs with equal access to United States courts is "easily harmonized with the line of cases granting less deference to plaintiffs residing overseas. Foreign plaintiffs deserve less deference, not because they lack United States citizenship, but simply because their overseas residence vitiates any presumption that they would find the U.S. forum convenient." *Varnelo,* 2003 WL 230741, at *12 (internal citation omitted).

in Charleston, West Virginia, is that "Davis was organized for the purpose of serving as a holding company to own various investments, including the shares in [GOK] that are at issue in this case." (Second Traum Decl. ¶¶ 7–8.)

The second American plaintiff, Holdex, was also organized by two nominee members under the laws of Texas in September 1999 for the "purpose of serving as a holding company to own various investments, including shares of Kachkanarsky GOK." (Second Traum Decl. ¶¶ 21, 24.) The beneficial owners of Holdex are both citizens of Israel. (Second Traum Decl. ¶ 27). Traum provides no other information linking Holdex to the United States besides a registered address in Austin, Texas. (Second Traum Decl. ¶ 23.)

Finally, Nexis is a company organized under the laws of Utah in October 1996 for the purposes of "serving as an operating company for various investments, including more than U.S. $13 million for trade financing with Kachkanarsky GOK and more than U.S. $ 4.5 million in investments in trade with a fertilizer plant in Kazakhstan." (Second Traum Decl. ¶¶ 30, 34.) Traum is the beneficial owner of Nexis, and the only other individual identified in association with the company is Isaac Savion, who serves as an officer in the company but whose exact title is not specified. (Second Traum Decl. ¶¶ 33, 40.) Traum claims that Nexis planned to open an electronics refurbishing center in San Diego, California. (Second Traum Decl. ¶¶ 35–36.) Not only has this not happened, but the e-commerce business that Nexis intended to establish in Canada to "compliment" the San Diego work has yet to come to fruition. (Second Traum Decl. ¶¶ 35–36.) No other ties to the United States are disclosed except for a registered address in Midale, Utah. (Second Traum Decl. ¶ 32.)

Traum's Second Declaration is the plaintiffs' sole submission provided to answer the Court's questions about the American plaintiffs' ties to the United States. It provides no bona fide reason for the plaintiffs to have sued in this Court. The declaration does not tell the Court why it would be more convenient for the parties to litigate this case here rather than in Russia. Nor does the declaration effectively counter the defendants' allegation that Davis, Holdex, and Nexis are nothing more than shell corporations whose choice of forum deserves little deference.

█ To the extent that the plaintiffs rely simply on the status of three of the ten plaintiffs as United States corporate citizens as the basis for bringing suit in New York, this strategy is without merit. These three plaintiffs appear to be nothing more than holding companies for shares of GOK and possibly other stocks. "[W]here an American plaintiff chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon citizenship as a talisman against forum non conveniens dismissal is diminished." *Sussman v. Bank of Israel*, 801 F.Supp. 1068, 1073 (S.D.N.Y.1992), *aff'd*, 990 F.2d 71 (2d Cir.1993) (per curiam). *Cf. Guidi v. Inter–Continental Hotels Corp.*, 224 F.3d 142, 147 (2d Cir.2000) ("This is not a case where the plaintiff is a corporation doing business abroad and can expect to litigate in foreign courts.").

The record before the Court points to nothing but forum shopping by the plaintiffs. All of the NKAZ Plaintiffs are foreign citizens whose complaints arise out of activities in connection with business that was transacted in Russia. All of the GOK plaintiffs are also complaining about activities that arise from the conduct of business in Russia. The contracts that are at issue in this case demonstrate that the plaintiffs

should not have expected that any of their disputes would be litigated in the United States. This makes sense in view of the fact that the contracts were for services to be performed in Russia. For example, the management contract (and subsequent amendments) between NKAZ and MIKOM contains a forum selection clause for the Moscow Arbitrazh Court. (NKAZ–MIKOM Contract dated June 21, 1996 ¶ 3.2 attached as Ex. 1 to Chernyshev Decl.)

The parties' own submissions reveal that at most one of the relevant contracts to the case contains a New York forum selection clause. (Defendants' Submission of The GOK and NKAZ Contracts ("Defendants' Contract Summary"); Chart of Contracts with U.S. and Other Non–Russian Plaintiffs ("Plaintiffs' Contract Summary") attached as Ex. A to letter from James L. Bernard to the Court dated Feb. 20, 2003.)

The plaintiffs identify only one relevant contract, a $13 million loan agreement between GOK and Nexis, which, as amended, contains a forum selection clause for the New York State Courts.[10] (Amended Contract between Nexis and GOK dated Nov. 25, 1999 ¶ 2 attached as Ex. 4 to Second Traum Decl.) Such a contract, if valid, constitutes a minuscule percentage of the damages in excess of $3 billion at issue in this case.[11] When compared with the myriad contracts providing for litigation and arbitration in fora outside the United States, there is no justification for litigating this case in New York based on this one contract alone. These other contracts include not only the MIKOM management contract, but all the various contracts that

10. The Second Traum Declaration mentions several contracts listed in the Plaintiffs' Contract Summary that appear to contain forum selection clauses for the New York courts but which are wholly irrelevant to this case. None of those contracts are referred to in the lengthy Amended Complaint and they are not at issue in this case. For example, Traum states that Davis purchased shares from two companies, Amber Star, LLC and Lenex, pursuant to three contracts signed in 1998 and 1999. (Second Traum Decl. ¶¶ 10–11; Amber Star–Davis Contract dated Sept. 28, 1999 ("Amber Star Contract") attached as Ex. 1 to Second Traum Decl.; Lenex–Davis Contracts dated Mar. 15, 1999 and Sept. 28, 1999 ("Lenex Contracts") attached as Ex. 2 to Second Traum Decl.) Traum notes that the contracts provide for the resolution of disputes in the New York State courts under New York and United States law. (Second Traum Decl. ¶¶ 10–11; Amber Star Contract ¶ 8.1; Lenex Contracts ¶¶ 8.1, 8.1.) This information is irrelevant to this case because these contracts are between Davis and two third parties and the issue of how Davis acquired the shares is not at issue in this case.

Similarly, Traum informs the Court that Holdex purchased shares from Polyprom by contract dated January 20, 2000 which, by an amendment dated January 26, 2000, provided for disputes to be resolved in the courts of the State of New York. (Second Traum Decl. ¶ 26; Amendment to Contract # KGOK–001/A of Jan. 20, 2000 dated Jan. 26, 2000 ¶ 1 attached as Ex. 3 to Second Traum Decl.) However, this contract is between two co-plaintiffs and is not at issue in this case.

11. The Amended Nexis–GOK Contract modified an original loan agreement between the parties which included a choice of forum clause for the Moscow Arbitrazh Courts and a Russian choice of law clause. (Contract between GOK and Nexis dated July 13, 1999 ¶¶ 5.4–5.5 attached as Ex. 4 to Second Traum Decl.) The defendants question the validity of the amendment in view of the fact that the document was never mentioned in the plaintiffs' submissions until after oral argument. Moreover, the defendants also allege that the amended contract was purportedly signed after Nexis had been involuntarily dissolved. (Application for Reinstatement of Nexis Products LLC filed Feb. 25, 2000 attached as Ex. 5 to letter from Michael D. Burrows to the Court dated Feb. 25, 2003.) For the reasons explained above, the validity of the amended contract is irrelevant because the Court will not defer to the forum selection clause of one contract that constitutes a de minimis portion of this case in view of the many other relevant contracts in which the parties agree to litigate in other fora.

the plaintiffs allege were unlawfully abrogated in the NKAZ and GOK bankruptcies with the exception of the $13 million loan. The forum selection clauses provided for a Russian forum or arbitration in Russia, Stockholm, or London. (*See* Defendants' Contract Summary; Plaintiffs' Contract Summary.)

The fact that in no other relevant contract do the parties to this litigation agree to litigate in the United States supports the Court's view that it should afford little deference to the plaintiffs' current choice of forum. This type of forum shopping is the antithesis of the bona fide connection to the plaintiffs' chosen forum that would cause the Court to defer to the plaintiffs' desires. There is no indication that the parties anticipated litigating in the United States or that the choice of this forum is based on true motives of convenience. Instead, having pursued various remedies in the Russian court system with unsatisfactory results,[12] the plaintiffs now seek to take their case to the United States. Such a tactical maneuver is not protected by the deference generally owed to the plaintiffs' choice of forum. *See Iragorri,* 274 F.3d at 72.

**(B)**

■ The next step in the Court's *forum non conveniens* inquiry is to determine the availability of an adequate alternative forum. Ordinarily, this requirement "will be satisfied when the defendant is 'amenable to process' in the other jurisdiction. In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum

may not be an adequate alternative...." *Aguinda v. Texaco, Inc.,* 303 F.3d 470, 476–77 (2d Cir.2002) (quoting *Piper,* 454 U.S. at 255 n. 22, 102 S.Ct. 252). For purposes of the motion to dismiss for *forum non conveniens,* all twenty defendants have explicitly consented to jurisdiction in the Russian courts. (Declaration of Michael D. Burrows dated Jan. 30, 2002 ("Burrows Decl.") ¶ 5; Declaration of Paul R. Grand dated Jan. 29, 2002 ("Grand Decl.") ¶ 3–4 attached as Ex. A to Burrows Decl.; Declaration of Victor Roger Rubin dated Jan. 29, 2002 ("Rubin Decl.") ¶ 4 attached as Ex. B to Burrows Decl.; Declaration of Brian S. Cousin dated Jan. 25, 2002 ("Cousin Decl.") ¶ 3 attached as Ex. C to Burrows Decl.; Declaration of Elizabeth M. Johnson dated Jan. 29, 2002 ("Johnson Decl.") ¶ 4 attached as Ex. D to Burrows Decl.; Affidavit of Robert E. Hauberg, Jr. sworn Jan. 25, 2002 ("Hauberg Aff.") ¶ 3 attached as Ex. E to Burrows Decl.; Declaration of Christopher D. Armeniades dated Jan. 24, 2002 ("Armeniades Decl.") ¶ 4 attached as Ex. F to Burrows Decl.; Declaration of John A. Redman dated Jan. 28, 2002 ("Redman Decl.") ¶ 2 attached as Ex. G to Burrows Decl.; Declaration of Richard Schaeffer dated Jan. 25, 2002 ("Schaeffer Decl.") ¶ 2 attached as Ex. H to Burrows Decl.) Russia is thus an "available" alternative forum. The next question is whether Russia provides the plaintiffs with adequate judicial remedies.

The plaintiffs argue that Russia is not an adequate alternative forum because of the alleged corruption of the Russian courts, and the arbitrazh courts that dealt with the NKAZ and GOK bankruptcies in

---

**12.** Plaintiffs BMT SA, Alucoal, and BMT Ltd. have initiated arbitrations against NKAZ in Zurich, Stockholm, and Cyprus, respectively, alleging breach of contracts that are also at issue in this case. (Chernyshev Decl. ¶¶ 156, 160, 164.) The Zurich arbitration was dismissed on December 9, 2002 for lack of arbitral jurisdiction. (Final Award on Juris-

diction in *Base Metal Trading SA v. OJSC Novokuznetsk Aluminium Plant* dated Dec. 9, 2002 at 143.) The fact that these plaintiffs have pursued simultaneous arbitrations on closely related issues underscores that they are forum shopping in filing suit before this Court.

particular. The Court has carefully considered the submissions of the parties to determine whether the defendants have borne their burden of showing that Russia is an available and adequate alternative forum. *See Monegasque*, 311 F.3d at 499 (finding Ukraine an adequate alternative forum and noting the reluctance to find foreign courts "corrupt" or "biased"); *Aguinda*, 303 F.3d at 478 (affirming adequacy of Ecuadorian courts despite allegations of corruption).[13]

 The Court must determine whether Russian law provides adequate, not identical, relief. *PT United Can Co. Ltd. v.* *Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 74 (2d Cir.1998). In answering this question, the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." Fed.R.Civ.P. 44.1; *see also Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 80 (2d Cir.2002) (court's determination of foreign law treated as question of law); *Euromepa, S.A. v. Esmerian*, 154 F.3d 24, 28 n. 2 (2d Cir.

---

13. The plaintiffs make two preliminary arguments with respect to the standard to be applied to this motion that should be considered at the outset.

First, the plaintiffs contend that the Court should apply a summary judgment standard to the defendants' motion. The Court would thus deny the motion if it found that the plaintiffs have raised genuine issues of material fact regarding their allegations of corruption and fraud. At the outset, the Court notes that the defendants are correct that the Court's consideration of documents outside of the pleadings does not automatically convert the motion to dismiss into a motion for summary judgment. *See, e.g., Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 645 (2d Cir.1956) ("in the determination of a motion to dismiss for forum non conveniens, the court may consider affidavits submitted by the moving and opposing parties"); *see also Varnelo*, 2003 WL 230741 (relying on affidavits and exhibits outside the pleadings in deciding a motion to dismiss on *forum non conveniens* grounds); *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, No. 96 Civ. 3669, 1997 WL 31194 (S.D.N.Y. Jan.28, 1997) (same), *aff'd*, 138 F.3d 65 (2d Cir.1998). The plaintiffs argue that the motion to dismiss before the Court is somehow different from most such motions because of the allegations of corruption in the alternative forum. However, judges in this district have considered similar allegations on *forum non conveniens* motions without transforming them into motions for summary judgment. *See, e.g., Abdullahi v. Pfizer*, No. 01 Civ. 8118, 2002 WL 31082956 (S.D.N.Y. Sept.17, 2002); *Monegasque de Reassurances S.A.M. v. NAK Naftogaz of Ukraine*,

158 F.Supp.2d 377 (S.D.N.Y.2001), *aff'd*, 311 F.3d 488 (2d Cir.2002). There is no reason to depart from the standards applied in past cases and to apply a summary judgment standard because of the submission of affidavits.

Second, the plaintiffs argue that the Court should judge this case in accordance with the standard enunciated by Judge Newman of the Second Circuit Court of Appeals writing for the Eleventh Circuit Court of Appeals in *Leon v. Millon Air, Inc.*, 251 F.3d 1305 (11th Cir. 2001). *See also Eastman Kodak Co. v. Kavlin*, 978 F.Supp. 1078, 1087 (S.D.Fla.1997) ("defendants bear the burden of proving that the alternative forum is available, and that defendants [sic] will not be unjustly prejudiced if they have to litigate" in the alternative forum). In *Leon*, the Court of Appeals found that "defendants have the ultimate burden of persuasion, but only where the plaintiff has substantiated his allegation of serious corruption or delay." *Leon*, 251 F.3d at 1312. *Leon* noted the difference among the various Courts of Appeals on the issue of the degree of presumption that a foreign forum enjoys as to its adequacy and the nature of the plaintiff's burden of production to raise a sufficient question as to the adequacy of the foreign forum. *Leon* also noted the deference afforded by the Court of Appeals for the Second Circuit to the adequacy of a foreign forum. *Leon*, 251 F.3d at 1312. *Leon* does not change the result here. In this case, as explained below, the defendants have satisfied their ultimate burden of showing that Russia is an adequate alternative forum.

1998) (questions of foreign law are questions of law, not of fact).

The parties have provided the Court with extensive submissions from purported experts in Russian law. The plaintiffs have moved to strike the declarations of two of the defendants' experts, Paul B. Stephan III and Sergei Zankovsky. To the extent that these submissions are helpful to the Court in understanding the Russian legal system, the Court may use the declarations to answer questions of law. The Court will not use the declarations to make determinations of fact because this is not proper under Rule 44.1. The Court must decide what weight, if any, to give to these declarations and to all of the evidence the Court uses in determining Russian law, but the Court will make such a determination rather than to merely strike informative testimony. *See Norwest Financial, Inc. v. Fernandez,* 86 F.Supp.2d 212, 228, n. 15 (S.D.N.Y.2000) (declining to strike expert testimony on Argentine labor law in view of the Second Circuit Court of Appeals urging district courts "to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations") (quoting *Curley v. AMR Corp.,* 153 F.3d 5, 13 (2d Cir.1998)), *aff'd,* 225 F.3d 646 (2d Cir.2000) (table). The plaintiffs' motions to strike the expert declarations are denied.

■ The plaintiffs bring claims for violations of RICO, intentional interference with contract, and conversion. The defendants and their experts contend that there are provisions of the Russian Civil Code that supply causes of action analogous to those alleged in this proceeding. (Stephan 2002 Decl. ¶¶ 23–24 [14]; Declaration of Igor Leonidovich Petrukhin ("Petrukhin") dated Jan. 26, 2002 ("Petrukhin Decl.") ¶¶ 23–31.) [15] Although there is no exact equivalent of the RICO statute in Russia, the defendants' legal experts argue convincingly that the plaintiffs can bring a cause of action for fraud that would provide an adequate alternative remedy. (Petrukhin Decl. ¶ 29; Stephan Decl. ¶ 23.) [16] *See PT United,* 138 F.3d at 74 ("the nonexistence of a RICO statute [in the alternative forum] does not, by itself, preclude the use of [another forum]") (collecting cases). Russian law also provides causes of action equivalent to conversion and intentional interference with contract. (Stephan 2002 Decl. ¶ 23.)

More particularly, the plaintiffs may bring civil and criminal actions for fraud in the Russian courts. (Declaration of Paul B. Stephan III dated February 19, 2003 ("Stephan 2003 Decl.") ¶ 9; Third Declaration of Igor Leonidovich Petrukhin (dated in Russian) ("Petrukhin Third Decl.") ¶ 4; Petrukhin Decl. ¶ 29.) In his January 26,

**14.** Stephan holds the Percy Brown, Jr. Chair and the E. James Kelly, Jr.-Class of 1965 Research Chair at the University of Virginia School of Law where he has taught Soviet and post-Soviet law continuously since joining the faculty in 1979. (Stephan 2002 Decl. ¶¶ 1–2.) Stephan has worked with the Russian court system, in particular with the arbitrazh courts, for over ten years. (Stephan 2002 Decl. ¶ 3.)

**15.** Petrukhin is a citizen and permanent resident of Russia who is currently Head of the Judicial System Department of the Institute of State and Law of the Russian Academy of Sciences, Professor of the Academic Law School (Moscow), and a member of the Mos-

cow bar. (Petrukhin Decl. ¶ 1.) Petrukhin's research focuses on court system organization and procedure, with a specialization in the judicial system, justice and human rights. (Petrukhin Decl. ¶ 8.) The plaintiffs have not moved to strike the expert declaration of Professor Petrukhin.

**16.** Petrukhin and Stephan concede that Russia does not provide treble damages for fraud as does RICO. (Petrukhin Decl. ¶ 32; Stephan 2002 Decl. ¶ 23.) This fact does not preclude the Court from dismissing the RICO claims on the basis of *forum non conveniens. See Transunion Corp. v. PepsiCo, Inc.,* 811 F.2d 127, 129 (2d Cir.1987).

2002 Declaration, Professor Petrukhin outlined two options that provide the plaintiffs with equivalent recourse for their RICO claims. (Petrukhin Decl. ¶ 29.) The plaintiffs may either:

(1) bring a civil law claim against the Defendants for compensation of damages caused by fraudulent actions or repayment of the amount of the unjust enrichment particularly for compensation for damages caused by the bad faith of the person unjustly enriched pursuant to Chapter 59 and Chapter 60 of the [Civil Code of Russia], and/or (2) request that the relevant authorities initiate a criminal investigation of the Defendants on fraud charges and, if any of the Defendants is held criminally liable, then file a civil lawsuit within a criminal proceeding....

(Petrukhin Decl. ¶ 29.)

Under the first alternative, the plaintiffs could bring a civil suit for damages caused by fraud. (Stephan 2003 Decl. ¶ 9.) Russia's Civil Code creates a general obligation to provide compensation for harm caused by the violation of a legal duty, to return unjustly obtained property, and to compensate for injuries caused by an unlawful taking, potentially in excess of the actual loss. (Stephan 2003 Decl. ¶ 9; Petrukhin Decl. ¶¶ 31–34.) Under the Civil Code, a party may seek compensation for damages caused by the fraudulent actions of another without any prior proof of criminal misconduct. (Stephan 2003 Decl. ¶ 9.)

The second alternative listed by Professor Petrukhin involves filing a petition with the General Prosecutor's Office of the Russian Federation. (Petrukhin Third Decl. ¶ 13.) The mere receipt of the petition would require the General Prosecutor's Office to make a pre-investigation examination of the allegations. (Petrukhin Third Decl. ¶ 14.) Should investigators decline to pursue criminal proceedings yet discover the commission of unlawful ac-

tions (even if not criminally punishable), the plaintiffs could use these findings to begin a civil proceeding in the arbitrazh or general jurisdiction courts in the manner discussed above. (Petrukhin Third Decl. ¶¶ 15, 27–28.) In the alternative, if prosecutors did bring criminal charges in association with the alleged illegal scheme, the plaintiffs could initiate a civil suit within the criminal proceedings to recover damages directly caused by the criminal acts perpetrated by the defendants. (Petrukhin Third Decl. ¶ 20.) Moreover, if the preliminary investigation supports the plaintiffs' contention that arbitrazh judges were bribed by the Conspirators in connection with the NKAZ and GOK bankruptcy proceedings, the judges would face criminal liability. (Petrukhin Third Decl. ¶ 23.)

The plaintiffs attempt to argue that there is no available cause of action for fraud in Russian and rely on the Declaration of Sergey B. Zaitsev ("Zaitsev"), a judge who retired in 1997 after two years service on the Federal Arbitrazh Court for the District of Moscow, having previously served in courts in Novosibirsk for approximately eighteen years. (Declaration of Sergey B. Zaitsev (dated in Russian) ("Zaitsev Decl.").) Zaitsev's argument is that Chapters 59 and 60 of the Civil Code do not provide explicitly for a cause of action for fraud. (Zaitsev Decl. ¶¶ 67–72.) However, those chapters do provide the general grounds for liability for damages and for unjust enrichment. Zaitsev cites no persuasive authority to limit those broad sections for liability and the opinions of Professor Stephan and Professor Petrukhin are plainly more persuasive. Similarly, there is no effective response to the existence of claims for conversion and interference with contract.

The plaintiffs launch three additional challenges to the adequacy of the Russian courts. First, they argue that the previ-

ously issued decisions of the Russian courts will prevent any availability for relief in this case because those actions must be overturned to obtain relief. Second, the plaintiffs argue that the original NKAZ and GOK bankruptcy proceedings were corrupt. Finally, the plaintiffs argue that the Russian courts are generally corrupt so that the Russian courts cannot be an adequate alternative forum.

The plaintiffs' argue that the prior decisions of the Russian courts would be an obstacle to their relief in the Russian judicial system. On its face, this is a curious argument because this Court would also owe deference to decisions of foreign courts unless it could be demonstrated that the decisions were not entitled to deference because, for example, they were rendered in such a way as to deny fundamental standards of procedural fairness, which the plaintiffs have not shown in this case. *See, e.g., Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 249–50 (2d Cir.1999) (affording comity to Brazilian bankruptcy proceeding where proceeding contained indicia of procedural fairness). There are, however, ample means in the Russian judicial system to overturn decisions that were obtained as a result of corruption and this argument therefore is not a basis for finding that there are no adequate remedies in the Russian courts.

In Russia the plaintiffs may pursue either appellate review of the allegedly fraudulent judicial decisions or may seek relief through wholly new claims. The appellate instance of the arbitrazh court has jurisdiction over allegations of wrongful conduct by the first instance arbitrazh court, as does the Federal Circuit Court and the Supreme Arbitrazh Court ("SAC"). (Stephan 2003 Decl. ¶ 4.) [17]

As an alternative to pursuing appellate review of an arbitrazh court ruling, a party injured by a fraudulently procured decision may seek relief under the newly enacted Arbitrazh Procedure Code of the Russian Federation ("APC") which went into effect on September 1, 2002. (Stephan 2003 Decl. ¶ 5; 2002 Arbitrazh Procedure Code of the Russian Federation (effective Sept. 1, 2002) ("APC") attached as App. B to Stephan 2003 Decl.) Under Article 292 of the APC, a party to an erroneous court judgment can petition the Supreme Arbitrazh Court to exercise supervisory jurisdiction over the case. (Stephan Decl. ¶ 6; APC Art. 292.) Although APC Article 292(3) allows litigants three months to make such a petition, the APC's implementing legislation granted any party to a judgment of an arbitrazh court currently in effect until March 31, 2003 to do so. [18] (Stephan 2002 Decl. ¶ 6.)

**17.** The arbitrazh courts resolve economic disputes, including claims for damages and breach of obligations, in which the parties are legal entities or individuals with the status of "individual entrepreneurs", private business people *who conduct entrepreneurial activities* and who are registered as individual entrepreneurs under Russian law. (Petrukhin Decl. ¶ 15.) If an individual without such status is a party to an economic dispute, the dispute is resolved in a court of general jurisdiction. (Petrukhin Decl. ¶ 15.)

The Civil Procedure Code of the Russian Federation ("CPC"), effective February 1, 2003, provides similar avenues of appellate review to those of the Arbitrazh Procedure

Code, including appellate review of erroneous or improper judgments, supervisory review of judgments that have gone into effect, and the reopening of judgments based on newly discovered circumstances. (Stephan 2003 Decl. ¶¶ 5–8; CPC *attached as App. D to Stephan 2003 Decl.*) Additionally, parties seeking supervisory review of a judgment of a court of general jurisdiction have an extension from the usual one year limitations period until February 1, 2004 to do so. (Stephan 2003 Decl. ¶ 8; CPC Article 376(2).)

**18.** Professor Petrukhin argues convincingly that the plaintiffs would not face statute of limitations problems with regard to their sub-

The APC also authorizes persons subject to a court judgment to bring newly discovered circumstances to the attention of the court that issued the judgment. (APC Arts. 309–17.) The discovery of "circumstances, essential for the case, which have not been and could not have been known to the applicant" is grounds for the revision of a judicial act. (APC Art. 311–1.) Of the seven instances provided by Article 311 that can serve as bases for such a revision, only two require a determination of the criminality of the persons that procured the contested judgment. (APC Arts. 311(2), (3).) In all cases, the aggrieved party must pursue relief within three months of the discovery of the circumstances comprising the

stantive allegations if forced to proceed in Russia because such limitations were tolled as of the filing of the Original and Amended Complaints in this action (for the NKAZ and GOK claims, respectively). (Petrukhin 2002 Decl. ¶ 34.) Moreover, the defendants have agreed not to raise any defense based on the statute of limitations or other time limit for bringing suit in any Russian Court that expired after the date the current lawsuit was filed until 90 days after any dismissal of this case becomes final. (Letter from Michael Burrows to the Court dated Mar. 21, 2003 ("Burrows Mar. 21, 2203 Letter").) The defendants have also agreed to join or cooperate in any motion necessary to extend such statute of limitations or other time period. (*Id.*)

The plaintiffs argue that the March 31, 2003 deadline is not a statute of limitations but rather a jurisdictional time limit that cannot be waived by a party or extended by the SAC. (Third Declaration of Sergey B. Zaitsev dated Mar. 20, 2003 ("Third Zaitsev Decl.") ¶¶ 9, 11 attached as Ex. A to letter from James Bernard to the Court dated Mar. 21, 2003 ("Bernard Mar. 21, 2003 Letter").) The plaintiffs contend that procedural time limits may not be restored or extended by arbitrazh courts unless the right to do so is expressly provided by law which, the plaintiffs argue, is not the case for the March 31, 2003 deadline under the APC. (Third Zaitsev Decl. ¶ 10; Fourth Declaration of Sergey B. Zaitsev dated Mar. 24, 2003 ("Fourth Zaitsev Decl.") ¶¶ 6, 12–14,

ground for review, but the party may seek appellate review if the court fails to correct its decision. (APC Arts. 312(1), 317(5).)

Russian law allows the parties to consent to jurisdiction in Moscow. (Stephan 2003 Decl. ¶ 15.) Doing so would remove the case from the allegedly corrupt Kemerovo and Kachkanar courts where the GOK and NKAZ bankruptcies were primarily adjudicated. By letter to the Court dated February 20, 2003, the defendants agreed to consent to venue in Moscow if the Court deemed it appropriate. (Letter from Michael D. Burrows to the Court dated Feb. 20, 2003.)

The Court has carefully considered the various arguments raised by Mr. Zaitsev, the plaintiffs' expert, and finds them con-

20 attached as Ex. A to letter from James Bernard to the Court dated Mar. 24, 2003.)

The defendants concede that a Russian court might conclude that the March 31, 2003 deadline cannot be extended, even with the consent of the parties. (Burrows Mar. 21, 2003 Letter.) Neither party is aware of any case in which a party has applied to the SAC for an extension of the deadline. (Burrows Mar. 21, 2003 Letter; Fourth Zaitsev Decl. ¶ 19.) The defendants are correct, however, that the plaintiffs have been on notice of the availability of this additional avenue of redress since the enactment of the APC in July 2002. (Burrows Mar. 21, 2003 Letter; Stephan 2003 Decl. ¶ 5.)

The March 31, 2003 deadline is not a barrier to dismissal. Petitioning the SAC is only one means of redress for the plaintiffs in the Russian courts. Moreover, the plaintiffs assumed the risk that an expiration of their time to petition the SAC could occur but have chosen not to pursue that avenue of review.

The defendants' agreement not to raise any statute of limitations or other time limit that expired after this case was filed until 90 days after the dismissal becomes final is reasonable. In view of the relatively small number of plaintiffs in the case and the claims at issue, the 90 day period to bring these claims in Russia is reasonable. *Cf. Aguinda*, 303 F.3d at 478–79 (providing for a one year tolling period given the number of plaintiffs involved).

tradicted by the more persuasive opinions of Professor Petrukhin and Professor Stephan. If Mr. Zaitsev were to be credited, despite the numerous avenues for obtaining judicial review, they are all ineffective. Mr. Zaitsev reaches that conclusion only by unreasonable interpretation of the review procedures. For example, he argues that APC 311(2) and (3) can only be used to open a corruptly obtained judgment after there has been a criminal conviction and then argues that the general provision of APC 311(1) cannot be used because it is too general and only applies to the "merits of the case, and not to corruption...." (Zaitsev Decl. ¶ 27.) It would be an unreasonable reading of the provisions for review, and would contradict the more credible opinion of the defendants' experts, to find that the review provisions would be interpreted in such a constricted way that allegations of corruption allegedly unknown at the time, and which prevented a correct decision on the merits, could not be raised in a timely fashion when the evidence became known.

The second specific challenge to the adequacy of the Russian courts rests on the plaintiffs' arguments that the bankruptcy proceedings were themselves corrupt and this demonstrates, according to the plaintiffs, that they could not obtain fair results in the Russian courts. This argument fails on several levels. First, the defendants have shown that there are various ways of challenging the past decisions. Moreover, there are claims that are independent of the past decisions. Furthermore, on the current record, the Court could not conclude that there has been a sufficient showing of corruption in the underlying proceedings. This is particularly so in view of the appellate decisions in the Russian courts that have affirmed various decisions about which the plaintiffs complain but for which there is no persuasive showing of any corruption.

In support of their contention that Governor Tuleyev used his influence to obtain results favorable to the Conspirators in the NKAZ bankruptcy, the plaintiffs offer the declaration of Valery Grishkovets ("Grishkovets") who worked as the director of the Regional Agency of the Federal Insolvency (Bankruptcy) Department ("FID") in the Kemerovo region from April 1994 through August 1998. (Declaration of Valery Borisovich Grishkovets (dated in Russian) ("Grishkovets Decl.") ¶ 3.) During his tenure, Grishkovets claims to have been "aware of a widespread practice of secret, informal contacts by the local governor's representatives with the judges of the Kemerovo Arbitrazh Court who heard bankruptcy cases. The purpose of those contacts was to convince the judges to issue the decisions that would conform to the demands of the governor." (Grishkovets Decl. ¶ 9.)

Grishkovets attests to meeting with judges of the Kemerovo Arbitrazh Court on numerous occasions on Tuleyev's instructions in order to influence the outcome of certain bankruptcy proceedings by convincing judges to appoint bankruptcy managers controlled by the Governor. (Grishkovets Decl. ¶¶ 10–53.) Grishkovets claims that he had inappropriate ex parte contacts with one judge in particular, Judge Segodina, who, as chair of the bankruptcy panel of the Kemerovo Arbitrazh Court, controlled the assignment of bankruptcy judges to various cases. (Grishkovets Decl. ¶ 10.)

Although Grishkovets does not claim to have played any role in the NKAZ bankruptcy, the plaintiffs ask the Court to infer from Grishkovets' allegedly extensive, improper contacts with Judge Segodina that the NKAZ bankruptcy was also corrupted by Tuleyev's influence over the judge. Judge Segodina participated in various contested aspects of the NKAZ bankrupt-

cy. (Declaration of Igor Rehkhovsky dated Sept. 16, 2002 ("Rehkhovsky Decl.") ¶¶ 144–48.)

The plaintiffs also cite the testimony of Sergey Kuznetsov ("Kuznetsov") who represented the Kemerovo government in bankruptcy matters from June, 1997 to February, 1998 and who allegedly tailored his reports and recommendations to suit Tuleyev's needs. (Declaration of Sergey Kuznetsov (dated in Russian) ("Kuznetsov Decl.") ¶¶ 3, 8.) The declaration indicates that Tuleyev was dissatisfied with the Kemerovo Arbitrazh Court. (Kuznetsov Decl. ¶ 20.) It also indicates that Kuznetsov faced criminal charges in Kemerovo which were subsequently dismissed. (Kuznetsov Decl. ¶ 56.)

The plaintiffs argue that Grishkovets' and Kuznetsov's declarations establish a pattern and practice of corruption in the Russian courts by the same individuals who allegedly corrupted the NKAZ proceedings. The declarations provide no testimony about the NKAZ proceedings themselves, or any direct knowledge by the declarants of the alleged corruption of those proceedings. Moreover, the declarations are the testimony of persons who claim to have corrupted the Kemerovo arbitrazh courts in the past but who now ask this Court to accept their word as true.

Even if the Grishkovets and Kuznetsov declarations did support the plaintiffs' allegations *in this case,* which they do not, the plaintiffs' papers fail to present any specific allegations that the subsequent appellate decisions upholding many of the Kemerovo Arbitrazh Court's decisions were corrupt. For example, the plaintiffs make no serious allegations of corruption as to the deci-

sion by the West Siberian Circuit Federal Arbitrazh Court upholding the Kemerovo Arbitrazh Court's Order appointing Chernyshev External Manager of NKAZ. (West Siberian District July 3, 2000 Decree.) Nor do the plaintiffs allege corruption as to the September 6, 2001 decision by that same court upholding the NKAZ bankruptcy settlement. (West Siberian Circuit Sept. 6, 2001 Resolution.) (*See, e.g.,* Plaintiffs' Oral Argument Exhibit Binder, tab entitled "NKAZ Bankruptcy Litigation.") The plaintiffs alleged that the three judge appellate court "rubber stamped" the lower court ruling, but affirmances, even summary affirmances, are not evidence of corruption. (*See* Rehkhovsky Decl. ¶ 167.) These were central decisions to the NKAZ bankruptcy. The lack of allegations of corruption at the appellate level undercuts the plaintiffs' contention that they cannot receive a fair trial of their claims anywhere in Russia.

The plaintiffs' allegations about the corruption of the GOK bankruptcy are similarly insufficient to counter the defendants' showing that Russia is an adequate alternative forum. The plaintiffs rely on the opinion of their expert, Marina Telyukina ("Telyukina"), who evaluated the GOK bankruptcy for signs of corruption or other illegality. (Declaration of Marina Telyukina (dated in Russian) ("Telyukina Decl.") ¶ 1.) [19] Telyukina concluded that the GOK bankruptcy settlement as approved by the GOK creditors must have been a sham because the parties agreed to terms that "in [her] opinion, no rational creditor would accept." (Telyukina Decl. ¶ 103.) Telyukina alleges that the Sverdlovsk Arbitrazh Court should have refused to af-

**19.** Telyukina is a Russian citizen who earned her postgraduate degree in law in 1997. (Telyukina Decl. ¶¶ 4–5.) She is currently Senior Scientific Researcher at the Institute of State and Law of the Russian Academy of Sciences and Assistant Professor of the M.M. Speran-

sky law faculty at the Academy of National Economy of the Government of the Russian Federation. (Telyukina Decl. ¶ 6.) She has authored over 80 publications on issues concerning Russian bankruptcy law. (Telyukina Decl. ¶ 8.)

firm the settlement because Leybout's claims as GOK's primary creditor were "obviously false." (Telyukina Decl. ¶ 105.)

But Telyukina offers no further insight why the court affirmed the settlement or how the arbitrazh court may have been corrupted—in fact she makes no direct allegation of corruption at all. Moreover, Telyukina acknowledges that appeals of that decision were twice dismissed by two separate appellate courts on technical grounds. (Telyukina Decl. ¶¶ 108–09.) She claims, however, that the "courts' reliance on formalistic arguments, and their inaction and disregard, lead me to the conclusion that the courts failed to ensure due process with fair regard for the rights of the creditors seeking justice in the courts." (Telyukina Decl. ¶ 110.) Such conclusory contentions are not the type of specific allegations of corruption, at the trial or appellate level, that would justify a conclusion that the Russian judiciary is so rife with corruption as to be an inadequate alternative forum.

The plaintiffs also cite the work of a Russian prosecutor who investigated the GOK bankruptcy. (Order to Close Criminal Case dated Nov. 24, 2001 ("Prosecutor's GOK Report") attached as Ex. 36 to Declaration of James L. Bernard dated Sept. 20, 2002 ("Bernard Decl.").) The plaintiffs fail to note, however, the prosecutor's ultimate conclusion that "indicators of an intentional bankruptcy are not present" in the case of GOK and that the corresponding criminal case was closed. (Prosecutor's GOK Report.)

Finally, the plaintiffs launch a breathtaking challenge to all of the Russian courts arguing that the Russian judiciary is so corrupt that the plaintiffs cannot obtain a fair decision anywhere in Russia. The plaintiffs present generalized descriptions of corruption that are insufficient to disqualify all of the possible Russian venues. Typical is the charge by Mr. Zaitsev, who served as a judge in the Russian judiciary for twenty years but who is now a consultant: "[T]he plaintiffs cannot expect a fair and impartial resolution of their claims in Russia, irrespective of whether they pursue their claims in Moscow, Kemerovo, Sverdlovsk or another region, and at all levels of the courts...." (Zaitsev Decl. ¶ 96.) The conclusory allegations are insufficient.

"The 'alternative forum is too corrupt to be adequate' argument does not enjoy a particularly impressive track record." *Eastman Kodak Co. v. Kavlin,* 978 F.Supp. 1078, 1084 (S.D.Fla.1997) (collecting cases); *see also Monegasque De Reassurances,* 311 F.3d at 493; *Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974, 981–82 (2d Cir.1993); *Abdullahi,* 2002 WL 31082956, at *8–9 (collecting cases). Other judges of this court have found Russia to be an adequate alternative forum. *See Varnelo,* 2003 WL 230741, at *13–18 (finding Russia an adequate alternative forum and rejecting plaintiff's contention that Russian courts would not exercise jurisdiction over non-Russian defendants as "inconceivable" on the facts of the case); *Pavlov v. Bank of New York Company, Inc.,* 135 F.Supp.2d 426 (S.D.N.Y.2001).[20]

---

**20.** The Court of Appeals vacated and remanded *Pavlov* by summary order dated January 14, 2002 on the ground that the district court improperly dismissed the plaintiffs' RICO claim for failure to adequately plead a RICO enterprise. On remand, the district court dismissed the case for the reasons stated in the defendants' memorandum of law regarding the plaintiffs' lack of standing and, in the alternative, for lack of prosecution. *See Pavlov v. Bank of New York Co., Inc.,* No. 99 Civ. 10347, 2002 WL 31324097, at *1 (S.D.N.Y. Oct.16, 2002). The Court of Appeals' summary order has no precedential effect and did not discuss the *forum non conveniens* issue.

In *Pavlov*, Judge Kaplan rejected the plaintiffs' argument that "the Russian legal system is corrupt and riddled with political influence, characteristics that allegedly would be at their worst given the political sensitivity of the subject matter of [the] case" which involved claims for the "looting and laundering of assets of several Russian banks." *Id.* at 428, 433. The court found that "it would be inappropriate for it to pass judgment on [the Russian judicial] system, particularly on the basis of the sort of broad brush, hearsay accounts upon which plaintiffs' attack rests." *Id.* at 434. Similarly, in *Parex Bank v. Russian Savings Bank*, 116 F.Supp.2d 415 (S.D.N.Y.2000), Judge Sweet noted that "[a] foreign forum is not inadequate despite employing different procedures or due to general allegations of judicial corruption." *Id.* at 423 (internal citation omitted). The court subsequently denied the plaintiff's claims that Russian courts provide insufficient procedural safeguards to ensure a fair trial and would be biased against the plaintiff, a Latvian entity, due to the strained political climate between Russia and Latvia. *Id.* at 424–25.[21] In so doing, Judge Sweet found it "notable that [the plaintiff] did not find Russia to be an inadequate forum due to lack of procedural fairness or discrimination when it filed its initial complaint [in the case] in the Moscow Arbitration Court." *Parex*, 116 F.Supp.2d at 425.[22]

The plaintiffs in this case have similarly pursued relief in the Russian courts until the results were not to their liking. Moreover, the plaintiffs voluntarily entered into numerous contracts in Russia relevant to this case that contain Russian forum selection clauses. The plaintiffs must have anticipated the possibility of litigation in Russia. *See Monegasque De Reassurances*, 311 F.3d at 499. "There is a substantial temerity to the claim that the forum where a party has chosen to transact business . . . is inadequate." *Eastman Kodak*, 978 F.Supp. at 1084–85.

BMT Ltd. recently acknowledged the availability of a fair and adequate forum in Russia and sought dismissal for *forum non conveniens* of an action against it in Guernsey in favor of adjudication in Russia. (*See* Judgment in the Royal Court of Guernsey Ordinary Division in the case of *Ruslan Borisovich Shamurin v. Base Metal Trading Ltd., Yurii Yurievich Zhivilo and Mikhail Zhivilo* dated July 23, 2001 ("Guernsey Judgment") attached as Ex. I to Burrows Decl.) The court denied the motion in view of the inconsistency with the position BMT Ltd. takes in this case. (Guernsey Judgment at 6–7.) The plaintiffs attempt to explain the apparent inconsistency by characterizing the Guernsey action as a "dispute [concerning] the ownership of an apartment in Russia" in which there was no evidence that the plaintiff had the ability to corrupt the Russian judiciary. (Pls.' Mem. Opp. at 88 n. 43.) But that case involved allegations that Mikhail Zhivilo used threats of violence and death against the plaintiff that caused the plaintiff to resign his directorship of BMT Ltd. and to transfer his shares in the company to Zhivilo and his brother Yuri Zhivilo.

---

**21.** The court in *Parex* ultimately found that "this is one of the rare cases in which the alternative forum provides 'no remedy at all'" because Russian law did not recognize the type of contracts at issue in the case as legally enforceable. *Id.* at 426 (quoting *Piper*, 454 U.S. at 254, 102 S.Ct. 252).

**22.** For the reasons explained by Judge Sweet, this Court also rejects the argument raised by the plaintiffs here that because Russia uses different procedures, relying on the continental civil model, rather than American procedures, Russian procedures are inadequate to assure fair resolution of disputes. *See Parex*, 116 F.Supp.2d at 424–25. (*See also* Stephan 2003 Decl. ¶ 16.)

(Guernsey Judgment 1.) BMT Ltd.'s claims in the Guernsey action, and the plaintiffs' subsequent attempts to justify those actions to this Court, undercut the credibility of their assertion that they cannot obtain adequate relief in Russia.

Nor are the public testimonials about problems facing the Russian judicial system cited by the plaintiffs sufficient.[23] These conclusory statements do not demonstrate that the plaintiffs cannot obtain relief within the Russian courts. While one plaintiffs' expert, Professor Ethan Burger ("Burger"), points to President Putin's 2001 Annual Message to the Federal Assembly as evidence of the corruption of the Russian judiciary, (Declaration of Ethan S. Burger dated Sept. 15, 2002 ("Burger Decl.") ¶ 25), the address acknowledges the need for reform but is not a wholesale indictment of the fairness of the Russian judiciary. (*See* Burger Decl. ¶ 25; Annual Message of President Vladimir Putin to the Federal Assembly (Part 1) dated Apr. 3, 2001 ("Putin Address 1") at 4 attached as Ex. 15 to Burger Decl.) Indeed, the avowed commitment to judicial reform by the highest levels of the Russian government, as well as the nature and scope of the allegations in this case, indicate that the case would not be subject to abuse and would receive sufficient public and political scrutiny to assure that the case would be tried fairly in Russia. *See Aguinda*, 303 F.3d at 478.

Should the plaintiffs prevail on the motion to dismiss and the case proceed to trial in this Court, the Court would be forced to consider approximately 120 Russian legal decisions related to the NKAZ and GOK bankruptcies and the GOK change of control. (Defendants' Chronology of GOK–Related Russian Court Decisions and Chronology of NKAZ ("Defendants' Decision Chart").) These decisions involved almost 150 Russian judges. (Defendants' Map of Russian Courts with Accompanying List of Judges.) This Court is not a court of appeals for the Russian legal system and will not act as such. To do so would amount to an act of judicial overreaching of the precise sort rejected by the Court of Appeals for the Second Circuit. The Court of Appeals has "repeatedly em-

---

**23.** This includes the plaintiffs' citations to United States Department of State reports that provide only minimal information about the Russian judiciary. Of the two reports cited, one dedicates only two paragraphs to the topic of the Russian judicial system, and the other is devoted to evaluating human rights in Russia, a subject not at issue in this case. (Declaration of Ethan S. Burger dated Sept. 15, 2002 ("Burger Decl.") ¶¶ 43–48; U.S. Department of State Background Note: Russia dated May 2000 at 5 attached as Ex. 46 to Burger Decl.; U.S. Department of State Country Reports on Human Rights Practices dated Feb. 23, 2001 attached as Ex. 47 to Burger Decl.) Such reports do not suffice to show the Russian forum inadequate. *See Abdullahi*, 2002 WL 31082956, at *9 (collecting cases).

Professor Burger also relies on popular and scholarly articles and reports from the United States and abroad, including Russia, in reaching his sweeping conclusion that the plaintiffs could not receive a fair resolution of their claims in the Russian courts. (Burger Decl. ¶¶ 8, 13, 21–23, 34–38, 70–71, 73.) However, many of the sources are cited for broad propositions such as the results of one survey that found that "[m]any people do not want to seek redress in the [Russian] courts because the unofficial expenditures are too onerous," (Burger Decl. ¶ 31), or a description in the *Washington Post* of the remarks given by President Putin to the Federal Assembly discussed in the text as part of an effort "designed to overhaul Russia's famously corrupt courts." (Burger Decl. ¶ 25.) Professor Burger's criticism goes beyond the Russian courts. He concludes as part of his expert opinion that, "In Russia, individuals who comply with the law are widely viewed as naïve and stupid." (Burger Decl. ¶ 59.) These broad and conclusory allegations, founded on multiple levels of hearsay, are insufficient to condemn the entire Russian judiciary as an inadequate alternative forum in which to try this case.

phasized that it is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." *See Blanco*, 997 F.2d at 982 (internal quotation marks omitted).

Considerations of comity also play an important role in the Court's *forum non conveniens* analysis. *See Blanco*, 997 F.2d at 982, 983; *Sussman*, 801 F.Supp. at 1078. In this light, the defendants have identified four Russian court decisions that are integral to this case but which, they claim, are not subject to allegations of corruption. These are 1) the July 3, 2000 decision by the West Siberian Circuit Federal Arbitrazh Court rejecting an appeal by BMT SA and MIKOM of the Kemerovo Arbitrazh Court's March 20, 2000 Order appointing Chernyshev External Manager of NKAZ, (West Siberian District July 3, 2000 Decree); 2) the September 6, 2001 decision of the West Siberian Circuit Federal Arbitrazh Court upholding the Kemerovo Arbitrazh Court's approval of the NKAZ bankruptcy settlement on appeal by BMT SA, (West Siberian Circuit Sept. 6, 2001 Resolution); 3) the August 21, 2001 decision of the Federal Arbitrazh Court for the Urals Circuit affirming the lower court's dismissal of Nexis' appeal of the GOK bankruptcy settlement, (Urals Circuit Aug. 21 2001 Determination); and 4) the September 5, 2001 decision of the Federal Arbitrazh Court for the Moscow Circuit upholding two lower court decisions

rejecting claims by Davis, Holdex, Omni and Foston against GOK's change in registrar. (Decree of the Moscow Circuit Federal Arbitrazh Court dated Sept. 5, 2001 attached as Ex. 71 to Kozyrev/Kapoura Decls.) The Court has reviewed the record and finds the defendants' contention to be true: The plaintiffs have made little, if any, attempt to articulate substantive allegations of corruption against these decisions which are clearly at the core of the plaintiffs' case. (*See, e.g.*, Plaintiffs' Oral Argument Exhibit Binder, tabs entitled "NKAZ Bankruptcy Litigation", "GOK Bankruptcy Litigation", and "GOK Shareholder Litigation" and associated citations.) In view of this fact, it would be a particular affront to notions of international comity for the Court effectively to ignore or overrule the findings of the Russian courts in these decisions.[24]

The plaintiffs would have this Court believe that there is no court in Russia that could provide a fair, uncorrupted forum for this dispute. (Zaitsev Decl. ¶ 96.) To agree with this assertion would be to accept a mass indictment of the Russian judicial system that is not supported by the record. For the reasons explained above, Russia is an adequate alternative forum for this dispute.

(C)

■ Having considered the plaintiffs' choice of forum and having found Russia

---

**24.** The plaintiffs concede the availability of an application for protest to the Supreme Arbitrazh Court for at least the first three of these decisions. (NKAZ Bankruptcy Litigation at 20, 29; GOK Bankruptcy Litigation at 4.) Moreover, the defendants contend that the Russian Constitutional Court's decision in March 2001 overruling previous limits on creditors' rights to appeal decisions of the arbitrazh courts provides a basis on which the plaintiffs could seek leave to appeal, within reasonable time, virtually all of the decisions taken by the Kemerovo Arbitrazh Court and

the Sverdlovsk Arbitrazh Court in connection with the NKAZ and GOK bankruptcies. (Decision of the Constitutional Court of the Russian Federation dated Mar. 12, 2001 attached as Ex. 7 to Second Declaration of Victory Vasilyevich Golubev dated Feb. 25, 2003; Second Declaration of Sergei Zankovsky (dated in Russian) ¶¶ 46, 121; Defendants' Decision Chart, GOK Chart n. 8.) Having failed to take advantage of the avenues of appeal open to them, the defendants argue, the plaintiffs now seek to appeal the Russian court decisions to this Court.

an adequate alternative forum, the Court now weighs the remaining private and public interest factors set forth by the Supreme Court in *Gilbert*, 330 U.S. at 508–09, 67 S.Ct. 839. The private factors to be considered in this case are 1) the relative ease of access to sources of proof; 2) the convenience of willing witnesses; 3) the availability of compulsory process for attaining the attendance of unwilling witnesses; and 4) the other practical problems that make trial easy, expeditious, and inexpensive. *See Gilbert*, 330 U.S. at 508, 67 S.Ct. 839; *accord Aguinda*, 303 F.3d at 479. "In applying these factors, the court should focus on the precise issues that are likely to be actually tried, taking into consideration the convenience of the parties and the availability of witnesses and the evidence needed for the trial of these issues." *Monegasque*, 311 F.3d at 500 (internal quotation marks omitted).

■■■ The list of potential non-party witnesses who appear in the Amended Complaint alone demonstrates why this litigation should proceed in Russia. On the NKAZ side of the case, the plaintiffs claim the involvement of numerous persons in Russia from whom the defendants would want to obtain evidence. The extensive list includes Kemerovo Governor Tuleyev; Russian "oligarchs" involved in the metallurgical industry with connections to Russian organized crime; unspecified witnesses to the SAZ, KRAZ, and BRAZ takeovers; members of the Kemerovo Regional Energy Commission and the Russian Federal Energy Commission; Sergey Chernysev, who served as Provisional and External manager of NKAZ; the local procurator who filed the "unusual" petition with the Kemerovo Arbitrazh Court to remove MIKOM from NKAZ's management; employees of Kuzbass, which joined with Conspirators to take over NKAZ; NKAZ's shareholders who were allegedly forced to sell their shares at distressed prices; as well as each of the unnamed judges who participated in each of the court actions that the defendants claim were corrupted. (*See, e.g.,* Am. Compl. ¶¶ 112–13, 125–47, 186, 208, 210, 239–40, 243, 306, 312).

The GOK allegations present a similarly extensive list of non-party witnesses in Russia from whom evidence would be critical. This list includes Sverdlovsk Oblast Governor Roussel; former GOK general director Khaidarov who was allegedly ordered to convince GOK's shareholders to transfer their shares to the Conspirators; the unnamed GOK shareholders; the "armed thugs" who took over GOK and their supporters in the regional authorities; employees of Leybout, which allegedly held a false $39 million promissary note from GOK; Oleg Kozyrev, who became Provisional and External Manager of GOK after its bankruptcy; employees of VRK Company; and the judges who presided over the allegedly corrupt bankruptcy proceedings as well as the cases allegedly illegally transferring the Davis Plaintiffs' shares. (*See, e.g.,* Am. Compl. ¶¶ 343–44, 352, 356, 360, 373, 389, 397.)

In view of the plaintiffs' allegations, which themselves appear to place most of these parties in Russia, the defendants argue persuasively that almost all of their likely witnesses are located in Russia or elsewhere, and that few, if any, are in the United States. (Grand Decl. ¶¶ 3–4; Rubin Decl. ¶¶ 2–3; Hauberg Aff. ¶ 2; Armeniades Decl. ¶ 3; Redmon Decl. ¶ 2; Declaration of Stalbek Mishakov dated Jan. 29, 2002 ("Mishakov Decl.") ¶¶ 4, 9.) And as third-parties to this action, the Court cannot compel such witnesses appear. *See Pavlov*, 135 F.Supp.2d at 436 ("This Court has no ability whatever to compel the production of documents or witnesses from Russia, which appears to be the locus of all or substantially all of the evidence concerning the core issues in the case....") Moreover, even if the Court

could do so, the striking number of Russian parties and witnesses involved in the case demonstrates the extreme inconvenience of bringing this case to trial in the United States.

The plaintiffs contend that such a list overlooks the fact that the plaintiffs allege predicate acts for their RICO claims that occurred in United States. These acts primarily include the laundering and transfer of funds through American banks. However, the relevant allegations that may involve witnesses located in the United States pale in comparison to those involving persons and companies located in Russia. Furthermore, it is unlikely that testimony from bank officials would be necessary in any forum simply to document that funds were transferred through the use of banks in the United States. Moreover, the plaintiffs' citation to the allegedly integral role in the illegal scheme played by United States defendants Kislin, Blonde Management, Pan–American and Sibirsky U.S. does little to persuade the Court that the action should remain here. This is because on the face of the Amended Complaint these parties were not the main actors to the events that led to the litigation and, moreover, each of the defendants has consented to jurisdiction in the Russian courts.

The plaintiffs urge the Court that in considering the convenience of the witnesses, the Court must account for the fact that certain of the plaintiffs' witnesses are "unable" to go to Russia. For example, the plaintiffs allege that Mikhail Zhivilo could not return to Russia for fear of prosecution on the allegedly false charges filed against him for the attempted murder of Governor Tuleyev. This Court cannot, however, determine whether the serious criminal charges pending against the witness in a sovereign foreign forum are justified. As such, Zhivilo's refusal to return to Russia to defend against the charges provides no ground for keeping the action here.

Similarly, Joseph Traum claims that he is unwilling to return to Russia for fear of prosecution on false drug charges and threats to his life. (First Traum Decl. ¶¶ 28–31; Second Traum Decl. ¶ 18.) Traum also alleges that Isaac Savion, the beneficial owners of Holdex, and unnamed members and officers of Davis are also unwilling to travel to Russia because of the threats against Traum. (Second Traum Decl. ¶¶ 20, 29, 41.) The Court cannot determine whether Traum faces legitimate prosecution in Russia. In any event, Traum is not a witness to the main allegations in the Amended Complaint. Moreover, Traum's fear of returning to Russia does not rise to the level of gravity at which courts within this Circuit have spared *parties,* not merely witnesses, from returning to a threatening forum. *See, e.g., Guidi,* 224 F.3d at 145 ("the special circumstances presented by this case—specifically, the emotional burden on Plaintiffs of returning to the country where they or their loved ones were shot in an act of religious terrorism—provide additional weight for favoring Plaintiffs' choice of their home forum for this litigation"); *Rasoulzadeh v. Associated Press,* 574 F.Supp. 854, 861 (S.D.N.Y.1983) ("I consider that if the plaintiffs returned to Iran to prosecute this claim, they would probably be shot."), *aff'd* 767 F.2d 908 (2d Cir.1985) (table). This is especially true for the other named and unnamed individuals for whom Traum claims to speak who allege no threats to their own lives or safety, but who instead refuse to go to Russia based on threats against Traum. It is clear that the convenience of the witnesses strongly favors litigation in Russia.

The bulk of the important documentary evidence in this case is also located in Russia. (Grand Decl. ¶ 3; Hauberg Aff.

¶ 2; Armeniades Decl ¶ 3; Redmon Decl. ¶ 2; Mishakov Decl. ¶¶ 4, 9.) Such documents would likely require translation in order to be useful to an American court (as would, presumably, many of the witnesses who might testify). The need for extensive document translation supports a finding that this forum is inconvenient. *See PT United*, 1997 WL 31194, at \*8.

The plaintiffs are correct that technological advances have lessened the burden of transporting documentary evidence, leading courts to afford this consideration less weight in the *forum non conveniens analysis*. *See DiRienzo*, 294 F.3d at 30. However, the substantial degree to which it appears that Russia and the Russian language outweigh the United States and English in the location and format of many of documents demonstrates the high burden of putting such evidence to use in this Court. Access to sources of proof thus tips heavily in favor of Russia.

Similarly, an assessment of the public interest factors also counsels in favor of dismissal for *forum non conveniens*. The public factors to be evaluated are 1) court congestion; 2) avoiding difficult problems in conflict of laws and the application of foreign law; 3) the unfairness of imposing jury duty on a community with no relation to the case; and 4) the interest of communities in having local disputes decided at home. *See Gilbert*, 330 U.S. at 509, 67 S.Ct. 839; *Aguinda*, 303 F.3d at 480.

First, considerations of court congestion favor neither forum. *See Varnelo*, 2003 WL 230741 at \*31. While this is a busy Court, the Court of Appeals has reminded us that the filling of judicial vacancies makes court congestion in this district "of little or no present significance." *Guidi*, 224 F.3d at 147 n. 5. The case could also be litigated expeditiously in Russia. (Stephan 2002 Decl. ¶ 13.) All of the principle events in this case transpired in Russia

and the action's connection to the Southern District of New York is far too attenuated to justify asking the citizens of this district to resolve the parties' dispute. *See Varnelo*, 2003 WL 230741, at \*32.

Second, there would likely be extensive application of Russian law in this case. The Amended Complaint contains myriad alleged violations of Russian law. These range from the claim that "[t]he procurator's petition [to remove NKAZ's management] was invalid on its face and should have been returned by the Kemerovo court because it was not prepared in accordance with Russian bankruptcy law," to the allegation that, in the event that triggered the GOK bankruptcy, "[t]he gas company's receivables were not overdue under the terms of a prior settlement agreement with GOK, and thus under Russian Law, they could not be used as a basis for the bankruptcy petition." (Am.Compl.¶¶ 240, 388.) Furthermore, this action challenges over 100 Russian court decisions, the validity of which will have to be determined under Russian law. Indeed, the plaintiffs ask the Court to conclude that some decisions must have been corrupt because they were so wrong under Russian law. Moreover, the parties have both submitted lists of the relevant contracts at issue in the case. (Defendants' Contract Summary; Plaintiffs' Contract Summary.) Virtually every contract calls for interpretation under laws other than those of the United States, primarily Russian law. (Defendants' Contract Summary.) Thus, although the need to apply foreign law is not alone sufficient to warrant dismissal, *Piper*, 454 U.S. at 260 n. 29, 102 S.Ct. 252, this factor weighs heavily in favor of dismissing this case in favor of a Russian forum.

The third and fourth factors weigh strongly in favor of dismissal. Russia's interest in adjudicating this action is far greater than any interest the United

States has in adjudicating this dispute. It would be unfair to require a New York jury to sit on this case. The plaintiffs' claims involve the bankruptcies of two major Russian companies. These bankruptcies were allegedly part of a larger scheme to take over the Russian aluminum and vanadium industries. The plaintiffs contend that the illegal scheme involved high level Russian politicians, as well as numerous members of the Russian judiciary. The controversy presents issues that are of clear import to Russian citizens that should be resolved by the Russian courts. By contrast, the case has virtually no connection with the United States or this district. As such, the local interest in resolution of the dispute is virtually none.

Based on an evaluation of all the private and public *Gilbert* factors, Russia is clearly the more convenient forum. Therefore, this action is dismissed.

## CONCLUSION

Any remaining arguments of the parties are either moot or without merit. The defendants' motions to dismiss for *forum non conveniens* are granted. This dismissal is based on the defendants' consent to jurisdiction in the Russian courts, consent to venue in Moscow, and waiver of any statute of limitations or other time limit that expired after this lawsuit was brought until 90 days after judgment in this case becomes final—all of which the defendants have agreed to do. It is not necessary for the Court to reach the other grounds asserted in the motion filed by the Sibirsky Defendants on behalf of all defendants. The motions to dismiss on the basis of comity are similarly denied without prejudice as moot. The plaintiffs' motions to strike the expert reports of Paul B. Stephan III and Sergei Zankovsky are also denied. The Clerk is directed to enter Judgment and to close this case.

**SO ORDERED.**